

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-7-1995

# United States v Bishop

Precedential or Non-Precedential:

Docket 94-5321

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"United States v Bishop" (1995). *1995 Decisions.* Paper 245.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/245

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 94-5321 and 94-5387
_____


UNITED STATES OF AMERICA

vs.

KEVIN BISHOP

Appellant, No. 94-5321.


_____


UNITED STATES OF AMERICA

vs.

EDWARD STOKES

Appellant, No. 94-5387.

_____


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. Criminal Nos. 93-cr-00552-2 and 93-cr-00552-1)

_____


ARGUED JUNE 28, 1995

BEFORE:  BECKER, LEWIS and GARTH, Circuit Judges.

(Filed September 7, 1995)

_____


1

Kim A. Otis (ARGUED)
Haveson & Otis
194 Nassau Street
Princeton, NJ  08542

          Attorney for Appellant, Kevin Bishop


Michael J. Sullivan (ARGUED)
Office of Federal Public Defender
972 Broad Street
Newark, NJ  07102

          Attorney for Appellant, Edward Stokes


Kevin McNulty (ARGUED)
Office of United States Attorney
970 Broad Street
Room 502
Newark, NJ  07102

          Attorney for Appellee

_____

OPINION OF THE COURT
_____


LEWIS, Circuit Judge.

     We are called upon in this case principally to perform one of our most delicate duties -- determining whether Congress exceeded its constitutional authority in enacting a federal law. At issue is the power of Congress to criminalize "carjacking" -- the armed theft of an automobile from the presence of another by force and violence or by intimidation.  Congress believed that it had the power to criminalize the carjacking of any motor vehicle that has been transported, shipped or received in interstate or foreign commerce, and accordingly enacted 18 U.S.C. § 2119 to do

just that.  Edward Stokes and Kevin Bishop were convicted under that statute of carjacking an automobile in East Orange, New Jersey.  They appeal their convictions on numerous grounds, most of which require little discussion.  However, we address in greater depth two of the arguments:  (1) that the Double Jeopardy Clause of the Fifth Amendment prohibited the district court from imposing consecutive sentences for carjacking in violation of 28 U.S.C. § 2119 and use of a firearm during the commission of a violent felony in violation of 28 U.S.C. § 924(c); and (2) that Congress exceeded its constitutional authority in enacting the carjacking statute.  We will affirm.

I.

Close to midnight on the warm, pleasant night of July 22, 1994, after getting a bite to eat, Roger Bradley decided to teach his fiancee, Grace Rollins, how to drive the new Dodge Shadow automobile Bradley had purchased just three weeks previously.  Bradley chose the parking lot of a Channel store in East Orange, New Jersey for the lesson and pulled his car into the lot.  Rollins practiced driving in the parking lot for a while, then decided that she had had enough, and the two got out of the car to switch positions.

As they did so, they were approached by two men.  One of the men put a pistol to Bradley's head and demanded the car keys; the other put a hand over Rollins' mouth and held her from behind.  After Bradley turned over the keys, the two men drove off, but not before both Bradley and Rollins got a good look at the man who had brandished the gun at Bradley.

4

Luckily, as the thieves pulled away in the car and Bradley ran out into the road, he spotted a police car that had just pulled into another nearby parking lot. Flagging down the police, Bradley described the incident and his automobile, and provided descriptions of the assailants. This information was broadcast over the police radio.

Officer Morris Rhodes of the East Orange Police Department heard the bulletin, and shortly thereafter an automobile matching the description drove by him. Its occupants fit the general description (two black males) Bradley had provided. Officer Rhodes followed without his lights on while radioing in the license plate number, then switched on the lights and siren when the report came back that the car was the vehicle in question.

The Shadow accelerated and tried to pass another car that was turning, but struck the other car and careened into a building. As Officer Rhodes pulled up to the scene, he saw a man exit through the driver's side window, fall to the pavement, get up, and run. Officer Rhodes gave chase, pulled his gun, and ordered the man to stop. The man stopped and was arrested and handcuffed. That man was Edward Stokes. Two guns were found on the floor of the automobile, but the other man who had been in the car was not found.

Officer Rhodes took Stokes to the police station and booked him, videotaping the procedure. At one point during the booking, one of the officers asked Stokes, who had been limping,

what was the matter with his leg. Stokes responded that he had hurt it in an accident.

Within an hour and a half of the carjacking, Bradley and Rollins were taken into a room at the police station, one at a time, to view a suspect. Prior to viewing the suspect, they had heard the police talking about having apprehended the man who had stolen the car. Through a one-way mirror, they both identified Stokes as the man who had held a gun to Bradley's head.

Kevin Bishop was arrested three months later on unrelated charges. Both he and Stokes were later indicted for carjacking in violation of 18 U.S.C. § 2119, use of a firearm during commission of a violent felony in violation of 18 U.S.C. § 924(c), and being felons in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

After the district court denied Bishop's motion to dismiss, which had alleged that the carjacking statute was unconstitutional, Bishop pleaded guilty to the charges against him on February 4, 1994. He received a sentence of 210 months of imprisonment, three years of supervised release and a $2,000 fine.

Stokes' case went to trial. Prior to that trial, the district court denied Stokes' motion to suppress evidence of the victims' out-of-court identification of him and to bar the government from using the victims to identify Stokes in court. At trial, the victims testified about their out-of-court identifications of Stokes and identified him as the perpetrator

6

again before the jury.  Also, over Stokes' objection, the district court permitted the government to introduce into evidence Stokes' comment during booking about injuring his leg and to show the jury the videotape of Stokes' booking.  The jury found Stokes guilty of carjacking and use of a firearm during the commission of a violent felony and (subsequently, in the second half of the bifurcated trial) of being a felon in possession of a firearm.  Stokes was sentenced to 248 months of imprisonment, three years of supervised release and a $5,000 fine.

Both Bishop and Stokes appealed,[0] and we consolidated their appeals for purposes of argument and disposition.  We have jurisdiction under 28 U.S.C. § 1291.

As we stated at the outset, although both Bishop and Stokes have raised numerous issues, we address in the body of this opinion only two issues:  Stokes' argument that the Double Jeopardy Clause of the Fifth Amendment prohibits consecutive sentences for carjacking (18 U.S.C. § 2119) and use of a firearm during the commission of a violent felony (18 U.S.C. § 924(c)); and Bishop's and Stokes' arguments that the carjacking statute is unconstitutional because in enacting the statute, Congress exceeded its authority under the Commerce Clause.[0]

_____

[0] Although Bishop pleaded guilty without reserving his right to appeal his motion to dismiss the indictment because of the alleged constitutional invalidity of section 2119, see Fed. R. Crim. P. 11(a)(2), we have jurisdiction over his appeal of this issue because it goes to the jurisdiction of the district court. Menna v. New York, 423 U.S. 61, 63 n.1 (1975); Blackledge v. Perry, 417 U.S. 21, 30 (1974).

[0] We have considered and reject Bishop's argument that the carjacking statute violates equal protection. See United States v. Watson, 815 F.Supp. 827, 832-36 (E.D. Pa. 1993).

7

                                    II.

_____

     Additionally, we reject Stokes' other arguments on appeal,
namely:  that the station house "show-up" of Stokes was so unduly
suggestive that the district court abused its discretion in
failing to exclude the evidence of the victims' out-of-court
identification of him and in refusing to bar their in-court
identifications; that the district court abused its discretion in
permitting the videotape of the booking procedure to be shown
during trial; and that the district court erred in failing to
suppress Stokes' comment about his leg injury during the booking
procedure.  None of these issues has merit.

     Although the show-up was arguably unnecessarily and
impermissibly suggestive, the district court did not commit clear
error in finding as matters of fact that the victims'
identifications were the result of their own recollections of the
crime and not the result of what may well have been an
impermissibly suggestive show-up.  Nor did the district court err
in concluding that the identifications were reliable.  Thus, the
identifications were admissible.  See Neil v. Biggers, 409 U.S.
188 (1972).

     Concerning admission of the videotape of the booking at
trial, Stokes provides no good reason why the videotape of the
booking should not have been shown to the jury, and the
government provided a number of good reasons why it was properly
introduced.  Thus, the district court did not abuse its
discretion in siding with the government.

     Finally, with respect to the court's admission at trial of
Stokes' non-Mirandized statement, we join the other courts of
appeals that have addressed the issue and recognize that there is
a "routine booking exception" to the requirements of Miranda v.
Arizona, 384 U.S. 436 (1966).  See United States v. Horton, 873
F.2d 180, 181 n.2 (8th Cir. 1989) (listing cases from First,
Second, Fifth, Seventh, Eighth and Eleventh Circuits recognizing
"routine booking exception").  Applying that exception in this
case, the district court did not commit clear error in finding
that the police officer's question about Stokes' limp was part of
the booking procedure designed to fulfill the government's
obligation to provide medical attention if necessary.  Thus, the
district court did not abuse its discretion in permitting the
statement to be introduced as evidence under the "routine booking
questions" exception to Miranda.

                                    8

Stokes argues that the Double Jeopardy Clause of the Fifth Amendment[0] prohibited the district court from imposing consecutive sentences upon him for carjacking in violation of 28 U.S.C. § 2119[0] and use of a firearm during the commission of a violent felony in violation of 28 U.S.C. § 924(c).[0]  Our standard

---

[0]     That Clause states, "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ."  U.S. Const., Amend. V.

[0]     At the time of the commission of the carjacking at issue here, Section 2119 provided that:

> Whoever, possessing a firearm as defined in section 921 of this title, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall--
>
> > (1) be fined under this title or imprisoned not more than 15 years, or both,
> >
> > (2) if serious bodily injury (as defined in section 1365 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and
> >
> > (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both.

18 U.S.C. § 2119 (Supp. V 1993).  The Violent Crime Control and Law Enforcement Act of 1994, enacted September 13, 1994, amended subsection (3) of this statute by adding a death penalty provision and the phrase "with the intent to cause death or serious bodily harm" in place of the phrase "possessing a firearm as defined in section 921 of this title."  Pub. L. 103-322, 108 Stat. 1796, 1970, Section 60003(a)(14) (1994).  We do not address the implications, if any, of this change upon the Double Jeopardy analysis in the text, and we view this change as having no impact upon our Commerce Clause discussion.

[0]     Section 924(c) provides in pertinent part:

9

of review is plenary.  United States v.  Lattany, 982 F.2d 866 (3rd Cir. 1992).

Stokes relies on the principle that the Double Jeopardy Clause prohibits multiple punishments for the same offense. However, as the Supreme Court has found, "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."  Missouri v. Hunter, 459 U.S. 359, 366 (1983).

Attempting to fit within this rubric, Stokes argues that we should apply the rule of statutory construction announced in Blockburger v. United States, 284 U.S. 299 (1932).  The essential question of that test is "whether each provision requires proof of an additional fact which the other does not." Id. at 304.  In this case, Stokes argues, since all violations of the carjacking statute necessarily constitute violations of § 924(c), the statutes fail the Blockburger test and their consecutive application would violate double jeopardy "in the absence of a clear indication of contrary legislative intent." Whalen v. United States, 445 U.S. 684 (1980).

Although we have not yet addressed the Double Jeopardy implications of 18 U.S.C. §§ 924(c) and 2119, Stokes' arguments have been raised in every other court of appeals except the

---

(1)  Whoever, during and in relation to any crime of violence . . . uses or carries a firearm shall, in addition to the punishment provided for such crime . . . be sentenced to imprisonment for five years. . . .

10

Seventh and D.C. Circuits. Defendants have lost every time. United States v. Centeno-Torres, 50 F.3d 84 (1st Cir. 1995); United States v. Mohammed, 27 F.3d 815, 819-20 (2d Cir. 1984); United States v. Johnson, 32 F.3d 82, 85 (4th Cir. 1994); United States v. Singleton, 16 F.3d 1419, 1425-29 (5th Cir. 1994); United States v. Johnson, 22 F.3d 106, 107-08 (6th Cir. 1994); United States v. Jones, 34 F.3d 596 (8th Cir. 1994); United States v. Martinez, 49 F.3d 1398 (9th Cir. 1995); United States v. Overstreet, 40 F.3d 1090 (10th Cir. 1994); United States v. Moore, 43 F.3d 568 (11th Cir. 1994). Indeed, when one evaluates the statutes at issue, it is evident why no appellate court has accepted Stokes' Double Jeopardy theory, for although Stokes wants us to apply Blockburger, to do so would be to put the cart before the horse. Blockburger applies when the legislative intent is not clear. Here, the statutes are clear. As the Second Circuit noted in Mohammed, "Because the legislative intent to impose a consecutive sentence for the violation of section 924(c) is plain from the language of that provision, . . . we need not consider the Blockburger test to conclude that the consecutive sentence imposed in this case did not violate double jeopardy." Mohammed, 27 F.3d at 819. This conclusion required the Mohammed court to move no mountains: as even a cursory reading of section 924(c) (supra n.5) confirms, that statute says that its punishment applies "in addition to the punishment provided for" the crime in which the firearm was used. Because Congress unambiguously provided that it wanted to impose a

11

consecutive sentence, the Double Jeopardy Clause is not triggered.

Even if we were to apply the Blockburger test to sections 924(c) and 2119, we would find no Double Jeopardy problem.  In this regard, we are persuaded by the reasoning of Judge Wisdom in United States v. Singleton, 16 F.3d 1419 (5th Cir. 1994).[0]  As Judge Wisdom explained, the clear indication in section 924(c) that its penalty was to apply "in addition to the punishment provided" for the underlying crime in which the firearm is used or carried "states that Congress intended for § 924(c)'s five-year sentence to be imposed cumulatively with the punishment for the predicate drug-related or violent crime." Singleton, 16 F.3d at 1425.  This Congressional intent, Judge Wisdom explained, eliminated any Blockburger problem.

Both of the objections raised by Stokes to this conclusion were addressed and rejected in Singleton.  First, Stokes argues that the legislative history of the 1984 amendments to section 924(c) demonstrate that Congressional concern was focused on responding to the Supreme Court's decision in United States v. Simpson, 435 U.S. 6 (1978), in which the Court had ruled that Congress had not intended former section 924(c) to be applied in conjunction with statutes that included their own

---

[0]     Judge Wisdom believed that the statutes failed the Blockburger test, in that proof of a violation of section 2119 necessarily proves a violation of section 924(c).  While we agree with the Second Circuit that the Blockburger test need not be applied to these statutes, we agree with Judge Wisdom that, if applied, Blockburger does not demonstrate a constitutional violation.

12

penalty enhancement provisions for the use of a firearm.

According to Stokes, Congress intended its 1984 amendments to

section 924(c) to clarify that 924(c) applied in such situations:

> Section 924(c) sets out an offense
> distinct from the underlying felony and is
> not simply a penalty provision . . . .
>
> [T]he Supreme Court's decisions in
> Simpson v. United States, and Busic v. United
> States, have negated the section's use in
> cases involving statutes . . . which have
> their own enhanced, but not mandatory,
> punishment provisions in situations where the
> offense is committed with a dangerous weapon.
> These are precisely the type of extremely
> dangerous offenses for which a mandatory
> punishment for the use of a firearm is the
> most appropriate.

S. Rep. No. 225 at 312, 1984 U.S.C.C.A.N. at 3490 (footnotes

omitted). According to Stokes, "[b]y 1992, the date of the

enactment of § 2119, the sentencing guidelines were in effect,

and minimum sentences based on the guideline calculations would

be applied to all § 2119 violators. Therefore, the stated intent

of the 1984 Congress in passing § 924(c) to assure mandatory jail

time for gun-toting offenders does not dictate consecutive

sentences for a statute adopted after the Guidelines were already

in effect." Stokes Br. 23. Without reproducing Judge Wisdom's

analysis of amended section 924(c) and its legislative history

here, however, we agree with his conclusion that the text and

legislative history "make it clear that Congress wanted to stack

§ 924(c)'s punishment atop all predicate crimes that came within

the statute, not just the Simpson/Busic variety of predicate

13

crimes for which the statutes included `enhancement' provisions." Singleton, 16 F.3d at 1427.

Second, Stokes attempts to escape the plain language of section 924(c) by arguing that, since 924(c) was enacted before section 2119, there is no clear legislative intent that the phrase "any crime of violence" in 924(c) meant "any crime of violence, including those enacted hereafter." Thus, according to Stokes, the legislative intent is not clear and the statutes cannot be applied in tandem. Again, we agree with Judge Wisdom that the sequence of enactment of the statutes is irrelevant. Once Congress has clearly stated an intention to stack punishments as it did in section 924(c), "it need not reiterate that intent in any subsequent statutes that fall within the previously defined class." Singleton, 16 F.3d at 1428. Otherwise, Congress would have to "repeat itself, restating in each subsequent enactment an intention Congress thought it clearly expressed once already. We see no reason to require such a convoluted approach to lawmaking." Id. Section 924(c) is clear, and applying multiple punishments under that provision and section 2119 does not violate Double Jeopardy.

### III.

We turn, therefore, to Bishop's and Stokes' argument that Congress exceeded its constitutional authority under the Commerce Clause when it enacted section 2119. Under the Commerce Clause, of course, Congress is empowered "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. This power has

14

been construed broadly to permit regulation of a great deal of modern life.[0] Thus, until recently, appellants' argument that Congress could not regulate the species of motor vehicle theft known as carjacking was uniformly rejected by the courts of appeals that had considered the issue.[0]

However, Bishop and Stokes believe that new life was breathed into their challenge on April 26, 1995. On that date, for the first time in more than half a century, the Supreme Court in United States v. Lopez, 115 S. Ct. 1624 (1995), invalidated a Congressional enactment solely because Congress had exceeded its authority under the Commerce Clause.[0] Because we will address

---

[0] Supreme Court precedents demonstrate the breadth of Congressional Commerce Clause power, which has been found to include the ability to regulate, for example, the company one keeps in a local barbecue restaurant or city hotel, Katzenbach v. McClung, 379 U.S. 294 (1964), and Heart of Atlanta Motel v. United States, 379 U.S. 241 (1964); the ability of a farmer to grow his or her own crops for personal consumption as he or she sees fit, Wickard v. Filburn, 317 U.S. 111 (1942); the ability of a loanshark to make extortionate extensions of credit, even though the particular transaction has no nexus with interstate commerce, Perez v. United States, 402 U.S. 146 (1971); and the ability of a landlord-turned-arsonist to put the match to his own rental property, whether or not he rented in interstate commerce, Russell v. United States, 471 U.S. 858 (1985).

[0] United States v. Williams, 51 F.3d 1004 (11th Cir. 1995); United States v. Martinez, 49 F.3d 1398 (9th Cir. 1995); United States v. Bell, 46 F.3d 442 (5th Cir. 1995); United States v. Overstreet, 40 F.3d 1090 (10th Cir. 1994); United States v. Harris, 25 F.3d 1275 (5th Cir. 1994); United States v. Johnson, 22 F.3d 106 (6th Cir. 1994).

[0] In National League of Cities v. Usury, 426 U.S. 833 (1976), the Court invalidated an extension of federal wage law to state operations because Congress' exertion of its Commerce Clause ran afoul of states' reserved powers under the Tenth Amendment. National League of Cities was subsequently overruled. Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528 (1985).

15

*Lopez* throughout the balance of this opinion, it is useful to provide an overview of the decision here.

At issue in *Lopez* was the constitutionality of the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone."  As one may observe from the language of the statute, nothing connected this statute overtly with commerce among the states or even any economic transaction.  To the contrary, it penalized the simple possession of any handgun within a "school zone," which was defined later in the statute (with certain exceptions) as the grounds of a public, private or parochial school or within 1000 feet of the grounds.  Alfonzo Lopez was convicted of violating the Act by bringing a .38 caliber handgun to school, but on appeal he persuaded the Fifth Circuit that the law was unconstitutional because it lacked the requisite nexus with interstate commerce.

The Supreme Court affirmed.  The Court noted that Congressional power under the Commerce Clause may involve three categories of regulation:  (1) Congress may regulate "the use of channels of interstate commerce"; (2) Congress may "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) Congress may "regulate those activities having a substantial relation to interstate

commerce, . . . _i.e.,_ those activities that substantially affect interstate commerce." _Lopez_, 115 S. Ct. at 1629.

The government in _Lopez_ tried to justify § 922(q) solely on the ground that it fit within Category Three, as "a regulation of an activity that substantially affects interstate commerce." _Lopez_, _id._ The Court noted, however, that § 922(q) by its terms was a criminal statute that "has nothing to do with `commerce' or any sort of economic enterprise, however broadly one might define those terms." _Id._ Furthermore, the Court noted that the statute "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." _Id._ at 1631. And the Court noted that the government had conceded that neither the statute nor its legislative history contained any findings concerning the effects upon interstate commerce of possession of a gun in a school zone. _Id._

The government's Category Three justifications were twofold. First, the government argued that possession of a gun in a school zone may result in an increase in violent crime, which in turn increases societal costs through increased insurance costs and also decreases travel to unsafe areas. _Id._ at 1632. Second, the government argued that guns in schools threaten the learning environment, which in turn creates a less productive citizenry and adversely affects the national economy. _Id._ The Court rejected these arguments as potentially limitless justifications for virtually any conceivable Congressional legislation. _Id._ Anything that might lead to violent crime

17

could be regulated under the government's "cost of crime" argument, the Court noted, as well as anything that was related to the productivity of individual citizens, including such traditional areas of state law as family law. Id. Seeing no other justification for the law, the Court found it unconstitutional.

The district court in this case found that section 2119 was constitutional, but did so without the benefit of Lopez. The parties initially briefed the Commerce Clause issue before us without the benefit of Lopez as well, leading us to hold the case pending the Court's decision in Lopez and then to request supplemental briefing.

Exercising plenary review of the district court's legal determination that section 2119 is constitutional, we will affirm.

### A.

The government's primary argument fits within the third category of problems which Congress may permissibly regulate under its Commerce Clause power: Congress may "regulate those activities having a substantial relation to interstate commerce, . . . i.e., those activities that substantially affect interstate commerce." Lopez, 115 S. Ct. at 1629. According to the government, section 2119 is justified under Category Three for two reasons: (1) Congress had a rational basis for believing that carjacking substantially affects interstate commerce; and (2) section 2119 has, as an element of the offense, a requirement

18

that there be a constitutionally adequate nexus with interstate commerce.  We agree with both arguments.

1.

(a)

Although ultimately the federal courts are the arbiters of constitutional questions, "the Commerce Clause grants Congress extensive power and ample discretion to determine its appropriate exercise."  Lopez, 115 S. Ct. at 1634 (Kennedy, J., concurring). We therefore must give substantial deference to a Congressional determination that it had the power to enact particular legislation.  As Justice Kennedy noted in his concurrence in Lopez,

> [t]he history of the judicial struggle to interpret the Commerce Clause during the transition from the economic system the Founders knew to the single, national market still emergent in our own era counsels great restraint before the Court determines that the Clause is insufficient support to an exercise of the national power.

Id.  And again, "Whatever the judicial role, it is axiomatic that Congress does have substantial discretion and control over the federal balance" between the national government and the states. Id. at 1639.  Deference to Congressional judgments about the contours of Commerce Clause power stems in part, as Justice Kennedy explained, from the fact that Congress is a coordinate branch of the federal government charged with the government's legislative authority.  Id. at 1634.

19

Indeed, the primary check upon Congressional action is its direct responsibility to the will of the people.  This has sometimes been stated categorically:

> The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections are, in this, as in many other instances . . . the sole restraints on which they have relied, to secure them from its abuse.  They are the restraints on which the people must often rely solely, in all representative governments.

Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 197 (1824) (Marshall, CJ.).  Notwithstanding the ultimate check of the ballot box, however, it is beyond peradventure (and was recently and forcefully demonstrated in Lopez itself) that the federal courts also must play a role in regulating the exercise of Congressional power:

> When the conduct of an enterprise affects commerce among the States is a matter of practical judgment, not to be determined by abstract notions.  The exercise of this practical judgment the Constitution entrusts primarily and very largely to Congress, subject to the latter's control by the electorate.  Great power was thus given to the Congress:  the power of legislation and thereby the power of passing judgment upon the needs of a complex society.  Strictly confined though far reaching power was given to this Court:  that of determining whether the Congress has exceeded limits allowable in reason for the judgment which it has exercised.

Polish National Alliance v. National Labor Relations Board, 322 U.S. 643, 650 (1944) (emphasis added).  Because the legislature has no "structural mechanisms to require those officials to undertake [the] principled task [of safeguarding federalism], and

20

[because of] the momentary political convenience often attendant upon their failure to do so," it is incumbent upon the courts to ensure that Congress does not overstep constitutional boundaries. Lopez, 115 S. Ct. at 1639 (Kennedy, J., concurring). "[T]he federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far." Id.

The Supreme Court's jurisprudence makes it abundantly clear that our job in this case is not to second-guess the legislative judgment of Congress that carjacking substantially affects interstate commerce, but rather to ensure that Congress had a rational basis for that conclusion. Chief Justice Rehnquist explained in Lopez,

> In Jones & Laughlin Steel, the Court warned that the scope of the interstate commerce power "must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectively obliterate the distinction between what is national and what is local and create a completely centralized government." [NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37 (1937)] . . . . Since that time, the Court has heeded that warning and undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce.

Lopez, 115 S. Ct. at 1629 (emphasis added). See also, e.g., id. at 1658 (Breyer, J., dissenting) ("the specific question before us, as the Court recognizes, is not whether the `regulated

21

activity sufficiently affected interstate commerce,' but, rather, whether Congress could have had a `rational basis' for so concluding").  "[T]he proper test requires an analysis of whether the regulated activity `substantially affects' interstate commerce."  Lopez, 115 S. Ct. at 1630.  We therefore turn to that inquiry.

(b)

The carjacking statute at issue in this case began as the first section (section 101) of what became the Anti Car Theft Act of 1992, Public Law No. 102-519.  In December 1991 and March 1992, Representative Charles E. Schumer held hearings on H.R. 4542, a multi-faceted piece of legislation addressing many aspects of auto theft.  As he explained, the purpose of the hearings was to "examine the scope of the auto crime problem, the different sectors of the auto theft industry and why it's so hard to catch and convict auto thieves."  Anti-Car Theft Act of 1992: Hearings on H.R. 4542 Before the Subcomm. on Crime and Criminal Justice of the House Comm. on the Judiciary, 102d Cong., 1st and 2d Sess. 3 (1991 and 1992) ("Anti-Car Theft Hearings") (statement of Rep. Schumer).

At those hearings, numerous persons testified about the scope and growth of the problem of auto theft in the United States.  More pertinent to our inquiry, testimony at those hearings also provided evidence that carjacking was emerging as a new and growing aspect of the auto theft problem.  See Id. 31-32 (testimony of Ron Thrash) (carjacking not a serious problem in New York City in terms of numbers, but "in other portions of the

22

country . . . they're having an increase in that particular type of crime"); 69 (testimony of Richard Jeffares) ("We do see an increase in carjacking . . . but we do not have statistics available on this"); 228 (prepared statement of Herman Brandau) (noting that organizations formed utilizing federal grants under the proposed Act "can help direct resources to the problems in particular areas which need the most attention. Most frightening is the emerging problem of carjacking"). Additionally, materials submitted for the hearings provided evidence that thieves who begin their auto theft careers as joy riders tend to become professionals. Id. at 268 (letter from William J. Lundy to Lyle Nirenberg of 3/23/92) (study "indicated that the people who get involved in [auto] theft for profit started out as joy riders who found that it could be turned into a profitable business"); see also id. at 306–310 (discussion in study).[0]

The House Report accompanying H.R. 4542 consisted of three parts: House Report (Judiciary Committee) No. 102–851(I) (August 12, 1992), House Report (Energy and Commerce Committee) No. 102–851(II) (Sept. 22, 1992), and House Report (Ways and Means Committee) No. 102–851(III) (Sept. 23, 1992), all reprinted

---

[0] Additional hearings were held in September 1992 before the House Subcommittee on Commerce, Consumer Protection, and Competitiveness of the House Energy and Commerce Subcommittee. See Anti-Car Theft and Content Labeling: Hearing on H.R. 4220, H.R. 4228, H.R. 4230 and H.R. 4542 Before the Subcomm. on Commerce, Consumer Protection, and Competitiveness of the House Comm. on Energy and Commerce, 102d Cong., 2d Sess. (1992). These hearings focused on efforts to label automobile parts, to make it more difficult to trade in the auto theft "after market" for stolen parts.

23

in 1992 U.S.C.C.A.N. 2829.[0]  Those reports included the following

significant findings:

>        "Automobile theft has become the nation's number one
         property crime problem.  More than 1.6 million motor
         vehicles were reported stolen in 1991, an increase of
         34% since 1986.  The stolen automobiles were worth an
         estimated $8-9 billion, representing over 50% of the
         value of property lost to crime."  House Report No.
         102-851(I) at 14.

>        "Auto theft has become a very large and lucrative
         business.  The typical auto thief is no longer a
         teenager seeking a joyride.  Now, auto theft is an
         industry peopled by professional criminals operating as
         part of profit-making enterprises."  Id.

>        Auto thieves "turn stolen cars into money in three
         ways":  (1) bringing stolen vehicles to "chop shops,"
         where they are taken apart and sold for parts;
         (2) "washing" the titles by obtaining an apparently
         valid title for stolen automobiles; and (3) exporting
         the vehicles for sale abroad.  "Enterprises using all
         three profiteering methods regularly engage in
         interstate, even international, trafficking of
         automobiles and auto parts.  Just as important, auto
         thieves have a severe and deleterious effect on
         interstate commerce by imposing significant costs on
         automobile consumers."  Id. at 14-15.

>        "In addition to economic costs, car owners are
         increasingly subject to violent crime.  The most recent
         development in auto theft is `armed carjacking.'  In
         these incidents, two or three criminals approach a car
         waiting at a traffic light, or stopped by means of a
         deliberate `fender-bender' accident, and force the
         driver to turn over the keys at gunpoint."  Id. at 15.

>        "Auto crime enforcement has been conducted primarily at
         the state and local level.  There are significant
         barriers to enforcement, however, that have resulted in
         49 out of 50 auto thieves escaping punishment.  Cars
         are stolen so easily and dismantled so rapidly that
         police intervention at the point of theft is rare.
         Also, overburdened state and local law enforcement
         agencies are often unable to give auto theft the
         attention it deserves.  Even when criminals are caught

---

[0]      There was no Senate report.

24

with a stolen car, it can be difficult to make a case in court for auto theft because the defendant can claim that he purchased the car without knowing that it had been stolen." Id. at 15.

> "[T]heft of motor vehicles is a national problem. It is, however, a complex problem that . . . is broader than carjacking and chop shop related thefts." House Report No. 102-851(II) at 12.

> The legislation is not aimed at joyriding. Id. at 13.

> "Perhaps relating to the opportunity for profit, criminals are increasingly committing violent crime in the form of `armed carjacking.'" House Report No. 102-851(III) at 2.

H.R. 4542 was taken up for vote by both houses of Congress in October 1992. Certainly, during the floor debate on the Act, legislators in both the House and Senate expressed outrage at the violent aspects of carjacking,[0] but statements also show that Congress believed carjacking to be a profit-making

---

[0] E.g., 138 Cong. Rec. H11,819 (statement of Rep. Ramstad) ("People are outraged and terrified by the heinous carjacking epidemic currently upon us. How can any civilized nation tolerate the brutal killing of a mother dragged 2 miles to her death, while desperately trying to reach for her infant child inside her commandeered car? How can any civilized people tolerate such despicable, outrageous criminal acts? They cannot and they will not"); id. at H11,820 (statement of Rep. Collins) ("The most shocking case [of carjacking] involved a young mother, who was dragged 2 miles to her death during a carjacking in Savage, MD, and whose baby was literally thrown from the car. This has absolutely galvanized public opinion and outcry that this Congress act now to address this awesome despicable crime"); id. at H11,821 (statement of Rep. Fazio) ("I doubt there are very many people in this area who have not heard about the young mother dragged to her death by carjackers. This senseless tragedy is but one of the many which has been occurring with increasing regularity across the country"); 138 Cong. Rec. S17,960 (daily ed. Oct. 8, 1992) (statement of Sen. Lautenberg) ("There are many dimensions to the vehicle theft problem, Mr. President. Perhaps the most disturbing is the emerging problem of violent carjacking").

25

crime,[0] and one which was a growing part of the interstate and international auto theft problem.[0]

Congress apparently concluded that the national and international problem of auto theft required a comprehensive approach to law enforcement. Thus, each provision of the Anti Car Theft Act of 1992 was designed to address one or more elements of the interstate business of automobile theft. The Act

---

[0]    E.g., 138 Cong. Rec. H11,821 (daily ed. Oct. 5, 1992) (statement of Rep. Hoyer) ("Carjacking is not just an impulsive, joyriding crime, but is oftentimes motivated by profit"); id. (statement of Rep. Fazio) ("Auto theft is no longer confined to youngsters out looking for a vehicle for joyriding. It has evolved into carjacking -- a version of auto theft that involves armed robbery of a vehicle while the driver is present -- an extremely lucrative business in this country. Carjacking has become a high-growth industry that includes both professional thieves and parts shops that deal in stolen auto parts, merchandise which can be worth up to 4 times as much as the car itself. And the crime is becoming more and more linked to violence -- to severe beatings, and even murder"); 138 Cong. Rec. S17,961 (daily ed. October 8, 1992) (statement of Sen. Pressler) ("Law enforcement officials have theorized vehicle thieves find it easier to use force than to deal with anti-theft devices installed in newer model cars. Additionally, carjackers can obtain the keys and registration papers for the cars they steal").

[0]    E.g., 138 Cong. Rec. H11,818 (daily ed. Oct. 5, 1992) (statement of Rep. Schumer) ("Our constituents are being terrorized by an insidious new form of car theft called carjacking"); id. at H11,821 (statement of Rep. Lowery) (carjacking provision is "a tough response to what has become a national problem"); id. at H11,821-22 (statement of Rep. Norton) ("With good reason, H.R. 4542 makes armed carjacking a Federal offense punishable by imprisonment for up to 15 years. These thefts often cross state lines, and, indeed, to do an effective job, law enforcement agencies have had to work regionally and nationally, rather than just locally"); 138 Cong. Rec. S17,961 (daily ed. October 8, 1992) (statement of Sen. Lautenberg) (noting that car theft is especially prevalent in New Jersey, and stating that "[c]arjacking threatens to spread rapidly around the nation, as criminals engage in copycat crimes. To prevent such a plague, we need to bring Federal resources to bear"). See also statement of Rep. Fazio, supra n.13.

26

not only criminalized carjacking (section 101), but also increased the fines and prison terms for importation and exportation of stolen vehicles (section 102) and interstate transportation or possession of such vehicles (section 103), and criminalized the operation of chop shops for dismantling stolen vehicles (section 105).[0] The Act also provided grants for the development of local "anti car theft committees" (section 130–133), mandated the development of a federal/state task force for addressing certain issues related to auto theft and fraud (section 140), developed a national system for combatting automobile title fraud (sections 201–04), expanded the coverage of federal law mandating the marking of automobile parts and requiring automobile repair shops to use the markings to avoid the use of stolen parts (sections 301–06), and mandated stricter Custom Service inspections in order to prevent exportation of stolen automobiles (section 401).

Together, the findings and floor statements -- and the structure of the Act itself -- suggest the following. Congress specifically found that auto theft is an interstate problem -- both that it is often an interstate business itself (albeit an illegal one) and that it gnawed away at the innards of the American economy by imposing other costs on society as well. Congress believed that auto theft was a vast, illicit trade substantially affecting interstate and foreign commerce. Auto theft cost consumers both through the direct economic losses

---

[0] Section 104 provided for civil and criminal forfeiture in certain cases involving auto theft.

27

caused by having their property taken from them, and through increased insurance costs. Congress further believed that carjacking was not mere joyriding, but a new and violent form of the illicit interstate business of auto theft. Finally, Congress believed that the national problem of auto theft required a comprehensive, national response addressing the many different aspects of the auto theft problem, because prior state efforts had failed to combat the problem effectively.

(c)

Bishop, Stokes, and the dissent assail the findings of Congress on a number of grounds. First, they contend the Supreme Court in Lopez created a "bright line" rule that unless an activity is "commercial" or "economic," it is beyond the power of Congress to regulate no matter what its effect upon interstate commerce. Stokes Supp. Reply Br. at 2. Because carjacking is not "commercial" or "economic," appellants contend, it is simply beyond the power of Congress to regulate.

We cannot accept this argument. The Court in Lopez disapproved of the statute at issue because possession of a handgun was neither economic nor "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Lopez, 115 S. Ct. at 1631. By contrast, we can easily appreciate how Congress could readily (and rationally) have believed that carjacking is both economically motivated and part of a greater economic activity. Indeed, the rationale supporting such a conclusion, and distinguishing this case from Lopez, is patently

28

obvious.  First, carjacking is economic in a way that possession of a handgun in a school zone is not.  When a criminal points a gun at a victim and takes his or her car, the criminal has made an economic gain and the victim has suffered an undeniable and substantial loss.  Replicated 15,000 or 20,000 times per year, the economic effects are indeed profound.  See infra n.22.  By comparison, no matter how many criminals possess guns in school zones, there is no direct economic effect that arises from the crimes.[0]

Furthermore, Congress enacted the carjacking provision as one aspect of a national solution to a national economic problem.  Every automobile theft is, by definition, local in its particulars, yet Congress could have rationally believed that it had to regulate carjacking -- whether or not it was strictly "commercial" or "economic" -- as one aspect of its comprehensive response to the national and international business of criminal auto theft.

---

[0]      Relatedly, appellants argue that the Supreme Court in Lopez rejected the theory that the "costs of crime" can support a finding that an activity substantially affects interstate commerce.  Bishop Supp. Br. 10.  This misreads Lopez, as well. In Lopez, the economic impact of mere possession of a handgun in a school zone was speculative at best.  One of the government's arguments was that gun possession might lead to violent crimes, the costs of which would be spread throughout society through increased insurance premiums.  Lopez, 115 S. Ct. at 1632.  By contrast, in enacting the Anti Car Theft Act of 1992, Congress did not rest its findings of substantial effect upon interstate commerce solely upon increased insurance costs, but also relied upon the direct costs to consumers from lost property resulting from auto theft.  Thus, the "cost of crime" justification used by Congress in this case is much more concrete than the theory rejected by the Court in Lopez.

29

The dissent argues that Congress' Commerce Clause power under category three is limited to regulation of "a voluntary economic exchange." Dissent at 4, 32. The Supreme Court has never before used this definition and the dissent does not state how or from where it is derived, nor how the definition accounts for prior Supreme Court cases which involved no voluntary economic exchange. See, e.g., Wickard v. Fillburn, 317 U.S. 111 (1942) (regulating the production and consumption of home-grown wheat). Where the Court has used a potentially ambiguous term, as "commercial" arguably is, we prefer to apply the definitions used by the court itself. Thus, we are content to rely on Lopez to define commercial as including those activities which form a part of an economic enterprise. Lopez, 115 S.Ct. at 1631.

Bishop and Stokes also contend that, whatever Congress may have believed about carjacking, it is simply irrational to believe that carjackers are professional thieves out for profit. Instead, they contend, carjackings are quintessential local crimes of violence. "Common sense suggests that it is highly unlikely that sophisticated theft rings would engage in carjacking in order to get cars to deliver to chop shops for profit when it is so easy to steal cars without having to resort to the obvious dangers involved in a crime of violence." Bishop Supp. Br. at 4. Again, we disagree. Of course, no one would dispute that carjacking is often violent -- and indeed often achieves its economic end only because of the violence employed. However, appellants' arguments are unpersuasive on at least two grounds. First, it is incumbent upon a party seeking to undercut

30

Congressional fact-finding to offer something more than mere "common sense" intuitions about "the way things are."  Yet appellants provided no data to the district court suggesting that they have a better grasp than Congress about what motivates carjackers or how sophisticated auto theft rings operate, and we, as an appellate tribunal, are hardly in a position to do so based upon our own conjectures.[0]

Second, available information actually undercuts appellants' "common sense" assertions.  In a 1992 report on carjacking, the Department of Justice noted that one of the motives behind carjacking is "to derive a profit from the resale of the vehicle or its parts."  Department of Justice, An Analysis of Carjacking in the United States (Oct. 14, 1992) at 3.[0]  Chop shops, salvage switching of vehicle identification numbers, exportation, and insurance fraud are some of the well defined activities that the study identified as for profit activities conducted by carjackers.  Id.  According to the report, law

---

[0]    Nor have appellants provided us with any information supporting their intuitions, assuming that it was appropriate for them to do so at this late stage.

[0]    While the report notes that economic gain is not the only or even the principal motive behind carjacking, the fact that additional motives exist is not relevant to our inquiry.  We must simply determine whether Congress could have rationally concluded that carjacking bears a substantial relationship to interstate commerce.  In order to meet this burden, economic gain need not be the exclusive motive for all carjackers.  Congress' determination that carjacking affects interstate commerce can be supported as long as economic gain is a motive. Cf. United States Railroad Retirement Bd. v. Fritz, 449 U.S. 166, 179 (1980) ("Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end.  It is, of course, `constitutionally irrelevant whether this reasoning in fact underlay the legislative decision.') (citation omitted).

enforcement officials have theorized that modern anti-theft devices have made it easier to carjack many vehicles than to steal them when they are parked. Id. at 2 (see also infra n.21). In addition, both contemporary news reports and reported case law bear witness to the fact that carjackers are often not joy riders, but rather criminals out for profit from the sale of a stolen automobile or its parts.[0] Thus, Congress' conclusions

---

[0] See Emily Culbertson, Man Pleads Guilty to Carjacking Spree, The (Philadelphia) Legal Intelligencer, Jan. 10, 1995, at 5 (defendant admits that he and friends carjacked automobile, stripped it for parts, and then burned the remains); Jane K. Martinez, Cars Parked Askew Lead to 4 Arrests, The Tampa Tribune, June 24, 1995, at 1 (police say carjacking ring had stolen six cars worth more than $100,000 that were "likely headed for a chop shop"); Jeannette DeSantis, 2 Arrested in "Chop Shop" Case, Los Angeles Times, Feb. 14, 1995, at B1 (police say foiled carjacker led them to chop shop); Vicky Ferstel, Ex-High School Athlete Pleads Guilty in Carjacking, The (Baton Rouge) Advocate, Dec. 16, 1994, at 3B (witness at trial testifies that carjackers took stolen automobile to mechanic in an attempt to have the automobile stripped for parts); Mary Murphy, Police Arrest 4, Seize 19 Vehicles in Theft-Ring Bust, The Orlando Sentinel, Sept. 30, 1994, at C1 (police found carjacked truck at illegal chop shop); S.K. Bardwell, "She Would Have Given Them the Keys in a Heartbeat", The Houston Chronicle, May 17, 1994, at A1 (police say carjackers usually have accomplices follow them in another automobile so that they can strip the stolen vehicle for parts and then flee). see also United States v. Three Male Juveniles, 49 F.3d 1058, 1060 (5th Cir. 1995) (defendants who carjacked automobile in Texas allegedly intended to take the automobile to California and "liquidate the vehicle to obtain funds to purchase crack cocaine, which they then intended to sell for a profit"). Although Three Male Juveniles involved a prosecution under 18 U.S.C. § 371 (conspiracy to unlawfully take a motor vehicle while possessing a firearm) and 18 U.S.C. § 2111 (unlawfully taking a motor vehicle while possessing a firearm), rather than section 2119, it did involve a carjacking, and it lends further support to the conclusion that economic gain, rather than mere violence for its own sake, is often at the heart of carjackings.

about the nature and effects of carjacking have been borne out by time.[0]

Appellants additionally argue that "it appears that there has never been any study or determination as to whether the purpose of a carjacking is to resell a car illegally or whether it is simply a crime of violence.  There is certainly no indication in the House Report that carjackers are, generally, members of so-called `sophisticated theft rings' who are reaping enormous profits from the theft of autos."  Bishop Supp. Br. 4.  This argument, however, assumes that Congress must meet a strict standard of specificity in finding facts and reporting its conclusions.  That is not so.  "Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review."  Turner Broadcasting System, Inc. v. FCC, 114 S. Ct. 2445, 2471 (1994) (opinion of Kennedy, J.).  Congress need not even rely solely upon evidence provided in hearings.  See Stafford v. Wallace, 258 U.S. 495, 513 (1922) ("It was for Congress to decide, from its general information and from such special evidence as was brought before it, the nature of the evils actually present or threatening, and to take such steps by

---

[0]     Of course, the fact that a legislative prediction does not come true does not necessarily mean that legislation premised upon it was irrational, provided there was evidence supporting the prediction.  "Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable."  Turner Broadcasting System v. FCC, 114 S. Ct. 2445, 2471 (1994) (opinion of Kennedy, J.).

legislation within its power as it deemed proper to remedy them").[0]  Congress rationally believed that carjacking was a new

---

[0]    Of course, we do not know all of the information that was known to the legislators who passed the Anti Car Theft Act of 1992.  That is one of the reasons why it would be difficult to second-guess Congress if that were our role.  As Justice Souter said in assessing the value of findings in Lopez, "In a case comparable to this one, we may have to dig hard to make a responsible judgment about what Congress could reasonably find, because the case may be close, and because judges tend not to be familiar with the facts that may or may not make it close." Lopez, 115 S. Ct. at 1656 (Souter, J., dissenting).  We know what was said at the hearings, and we know what was written in the legislative reports.  Yet almost certainly the legislators had other data before them that is not part of the evidence in the "legislative history" of the Act -- data from their own personal experiences, their discussions with constituents, and their own reading.  For example, during the period during which H.R. 4542 was under consideration, newspapers and periodicals, usually quoting police or even carjackers, reported that carjackers often strip stolen automobiles for their parts (e.g., David Kocieniewski, 2 B'klyn Men Are Nabbed in Manhattan Carnaping, Newsday, Oct. 13, 1992, at 22); that they often sell stolen automobiles to illegal "chop shops" (e.g., To Foil a Thief, The Economist, Oct. 17, 1992, at 30; Jennifer Nagorka, Carjack Suspects Arrested; Police:  2 May Be Tied to as Many as 20 Cases, Dallas Morning News, Oct. 10, 1992, at 33A; Nora Zamichow, "Carjackings," Violent Form of Auto Theft, Reported on the Rise, Los Angeles Times, Oct. 9, 1992, at A3; James Harney, Greed, Drugs Drove Detroit's "King", USA Today, Oct. 7, 1992, at A2; Arnold Abrams, Police Unit to Deal With Carjacking; County to Aid Great Neck Peninsula, Newsday, June 7, 1992, at 1; Joe Hughes, Car Theft Takes New Turn; Number of "Carjackings" Accelerating in San Diego, The San Diego Union-Tribune, March 17, 1992, at A1); and that carjackings were increasing for a variety of reasons, including the fact that modern anti-theft devices make it safer, easier and more profitable to carjack than to steal a parked car (e.g., Zamichow, supra; Ben Barber, Terror on the Roads, Calgary Herald, Oct. 4, 1992, at B2; Gordon Witkin et al., Willing to Kill for a Car, U.S. News & World Report, Sept. 21, 1992, at 40, 42; "I Want Your Car, Just Get Out":  Carjackers Growing Problem, Orlando Sentinel Tribune, Sept. 20, 1992, at A12); Abrams, supra; Susan Forrest, Car Thieves Find Another Way; County Being Plagued by Rash of "Carjackings", Newsday, March 26, 1992, at 35; Hughes, supra).

but substantial[0] and growing aspect of the vast interstate auto theft problem.  As we noted earlier (supra pp. 21-24), Congress heard evidence that carjacking was a new form of auto theft that was spreading throughout the nation.  It also was presented with evidence that even thieves who begin as joy riders tend to become professionals -- professionals who would feed the illicit auto theft aftermarket for stolen vehicles and parts.  Thus, Congress may have believed that even if a carjacker's first crime was committed for some non-economic motive, he or she would likely soon be a part of the national auto theft problem.  In such circumstances, Congress need not have refrained from legislating until the carjacking problem reached crisis proportions.  Katzenbach v. McClung, 379 U.S. 294, 301 (1964).[0]

(d)

---

[0]    News reports at the time of the passage of the Anti Car Theft Act of 1992 indicated that there were 15,000 to 20,000 carjackings per year.  Ben Barber, Terror on the Roads, Calgary Herald, Oct. 4, 1992, at B2.  If the average loss for each automobile theft in 1992 was $5,000 (see Anti-Car Theft Hearings, supra, at 7 (statement of Lee P. Brown); id. at 210 (statement of David F. Snyder)), the direct costs of carjacking to victims was between $75,000,000 and $100,000,000.  Cf. Hodel v. Indiana, 452 U.S. 314, 325 (1981) (disapproving district court finding that only an insignificant amount of interstate commerce was involved in case, and noting that "the 0.04% of corn production" at stake "would have had an approximate value of $5.16 million which is surely not an insignificant amount of commerce").

[0]    Neither Bishop nor Stokes appear to contend that, even if Congress had a rational basis for deciding that carjacking substantially affects interstate commerce, it nevertheless enacted a statute that was not a "reasonable and appropriate" means of addressing the perceived evil.  See Heart of Atlanta Motel v. United States, 379 U.S. at 258-59.  Inasmuch as this argument may have been raised, however, we believe that criminalizing carjacking was a wholly reasonable and appropriate response to the problem.

In addition to their complaints about the Congressional findings, Bishop and Stokes also protest that there was no showing that they were members of a criminal enterprise or sophisticated car theft ring. Bishop Supp. Br. 5. This argument, too, misconceives Congressional power. It is within Congressional authority to criminalize or regulate activities that, although purely local and intrastate themselves, comprise a class of activities that, when aggregated, substantially affect interstate commerce. Lopez, 115 S. Ct. at 1631; Russell v. United States, 471 U.S. 858, 862 (1985); Hodel v. Indiana, 452 U.S. 314, 324 (1981); Fry v. United States, 421 U.S. 542, 547 (1975); Perez v. United States, 402 U.S. 146, 154 (1971); Maryland v. Wirtz, 392 U.S. 183, 193 (1968); Wickard v. Filburn, 317 U.S. 111, 127-28 (1942). "If interstate commerce [ultimately] feels the pinch, it does not matter how local the operation which applies the squeeze." United States v. Women's Sportswear Mfg. Ass'n, 336 U.S. 460, 464 (1949). Since Congress rationally believed that carjacking, as an economic (i.e. profit-making) activity, substantially affects interstate commerce, we do not "have the power to excise, as trivial, individual instances falling within [that] rationally defined class of activities . . . ." Maryland v. Wirtz, 392 U.S. at 193.

(e)

Bishop and Stokes finally argue that permitting the federal government to criminalize carjacking would be an "unwarranted intrusion into the states' primary authority to define and enforce criminal law." Bishop Supp. Br. 7. Yet

36

again, appellants lean on <u>Lopez</u>, but find no support.  Obviously, this statute is a criminal law, and by virtue of that fact it intrudes upon states' traditional dominion over the criminal law. <u>Lopez</u>, 115 S. Ct. at 1631 n.3 ("Under our federal system, the `States possess primary authority for defining and enforcing the criminal law'").  Yet not every federal foray into criminal law is invalid.  Here, we believe that there is no great upset of the careful balance of federalism.

Congress recognized that auto theft had traditionally been combatted on the state level, but found that auto theft (including carjacking) was a <u>national</u> problem with a substantial impact upon commerce, and that state efforts to combat auto theft had failed to halt the growth of the auto theft industry.  <u>Supra</u> pp. 23-26.  In the same Act in which it criminalized carjacking, Congress mandated funds to support local anti-car theft efforts and created a federal/state task force to address issues involved in the problem.  Thus, Congress did not ignore its "sworn obligation to preserve and protect the Constitution in maintaining the federal balance . . . ."  <u>Lopez</u>, 115 U.S. at 1639 (Kennedy, J., concurring).  Instead, exercising its "substantial discretion and control over the federal balance" (<u>id.</u> at 1639), Congress determined that the national problem warranted the enactment of curative legislation.  We see this not as wrongful usurpation, but rather reasoned, responsible legislation.

Nor do we believe that finding section 2119 constitutional sets the stage for future upset of the federal/state balance.  Local activities may become the subject

37

of national legislation when they are found to be part of a national problem with a substantial impact upon interstate commerce. Congress reasonably found the local activity of carjacking to be a part of the national auto theft problem, and it criminalized carjacking as one rather minor aspect of a comprehensive effort to solve that problem.[0] Finding that section 2119 passes constitutional muster does not suggest that every local criminal activity may be criminalized by Congress, or even that every such activity that results in economic gain may be criminalized. It does suggest that if a criminal activity is rationally believed to be one of the conduits of a nationwide and international pipeline of illegal activity, Congress may justifiably step in and regulate that activity although it is wholly intrastate.[0]

---

[0] We note in passing that President Bush's statement upon signing the Anti Car Theft Act of 1992 singled out the carjacking provision for particular praise, noting that "[t]his bill makes armed carjacking a Federal offense. The recent wave of these carjackings has made the need for action clear." Statement By President George Bush Upon Signing H.R. 4542, 28 Weekly Comp. of Pres. Doc. 2122 (Nov. 2, 1992). We would find this of relatively minor significance but for the fact that the Supreme Court in Lopez specifically noted President Bush's concern upon signing the Gun-Free School Zone Act that, "[m]ost egregiously," the possession statute "inappropriately overrides legitimate state firearms laws with a new and unnecessary Federal law. The policies reflected in these provisions could legitimately be adopted by the States, but they should not be imposed upon the States by Congress." See Lopez, 115 S. Ct. at 1631 n.3, quoting Statement of President George Bush on Signing the Crime Control Act of 1990, 26 Weekly Comp. of Pres. Doc. 1944, 1945 (No. 29, 1990).

[0] In this way, section 2119 is no less intrusive into areas traditionally reserved for state supervision than was the loansharking law upheld in Perez v. United States, 402 U.S. 146 (1971) -- a case cited approvingly and relied upon throughout Lopez. See Lopez, 115 S. Ct. at 1629-31. In Perez, Congress had

38

2.

Unlike the statute in Lopez, section 2119 contains a "jurisdictional element" which ostensibly limits its application to activities substantially related to interstate commerce. Relying upon United States v. Bass, 404 U.S. 336 (1971), and Scarborough v. United States, 431 U.S. 563 (1977), the government contends that because section 2119 requires the government to prove beyond a reasonable doubt that the carjacking victim's motor vehicle "has been transported, shipped or received in interstate or foreign commerce," the requisite interstate nexus is shown in every case in which conviction is secured. This jurisdictional element, the government contends, wholly distinguishes Lopez and renders section 2119 constitutional. We agree. The mere presence of a jurisdictional element, however, does not in and of itself insulate a statute from judicial scrutiny under the Commerce Clause, or render it per se constitutional. To the contrary, courts must inquire further to determine whether the jurisdictional element has the requisite

criminalized loansharking because it believed it to be a significant means by which enterprises engaged in organized crime "launder" the proceeds of their illegal activities. Perez, 402 U.S. at 149-50, 155-56. The law did not require the government to prove that a particular extortionate extension of credit was made by a racketeer or that it had anything to do with interstate commerce. Yet the Supreme Court found that Congress had reasonably believed that national efforts were required to combat organized crime. The Court reviewed the significant amount of factual data that was before Congress when it enacted the law (id. at 155-56), but added that it did so "not to infer that Congress need make particularized findings in order to legislate. We relate the history of the Act in detail to answer the impassioned plea of petitioner that all that is involved in loansharking is a traditionally local activity" (id. at 156-57).

39

nexus with interstate commerce. Lopez, 115 S.Ct. at 1631 (stating that the statute at issue had "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect interstate commerce."). We must, therefore, determine whether the jurisdictional component in this case limits the statute to items that have an explicit connection with, or effect upon, interstate commerce. We conclude that it does.

Because section 2119 is limited to cars that have traveled in interstate or foreign commerce, the Supreme Court's decisions in Bass and Scarborough compel the conclusion that the jurisdictional element in section 2119 provides a nexus sufficient to protect the statute from constitutional infirmity. In Bass, the Court interpreted former 18 U.S.C. § 1202(a) (now 18 U.S.C. § 922(g)(1)), which had criminalized a felon's "recei[pt], possess[ion], or transport[ation] in commerce or affecting commerce . . . [of] any firearm." Bass, 404 U.S. at 337. Bass, a convicted felon, was convicted of possessing firearms, but the government had not alleged or proven that the firearms had been possessed in commerce or affecting commerce. Before the Supreme Court, the government contended that it need not do so, since the phrase "in commerce or affecting commerce" modified only "transportation," and not "receipt" or "possession." The Court found the statute to be ambiguous, and therefore applied two rules of construction. First, the Court determined that, following the rule of lenity, it should construe section 1202(a) to require the government to prove that the "receipt" or

40

"possession" of a firearm were "in commerce or affecting commerce," just as it had to prove that a "transportation" of firearms met that qualification.  Id. at 347-48.  Second, it applied the rule that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance."  Id. at 349.  This principle, as well, counseled that the Court require the government to prove that Bass's possession of the firearms was in or affecting commerce. The government would meet this burden, the Court explained, if it "demonstrates that the firearm received has previously traveled in interstate commerce."  Id. at 350.  The Court recognized that this was "not the narrowest possible reading of the statute," but it found that, "given the evils that prompted the statute and the basic legislative purpose of restricting the firearm-related activity of convicted felons, the readings we give to the commerce requirement, although not all narrow, are appropriate." Id. at 351.  Since the government had not sought to prove any interstate nexus, Bass's conviction could not stand.

In Scarborough, the Supreme Court revisited former section 1202(a), this time to describe the nature of the proof required of the government in order to establish that a possession had been "in commerce or affecting commerce." Scarborough had been convicted of possessing firearms as a convicted felon, notwithstanding his argument that "proof that the firearms had at some time traveled in interstate commerce did not provide an adequate nexus between the possession and commerce."  Scarborough, 431 U.S. at 566.  The Court framed the

question presented as "whether proof that the possessed firearm previously traveled in interstate commerce is sufficient to satisfy the statutorily required nexus between the possession of a firearm by a convicted felon and commerce." Id. at 564. To the Court, this question was one of simple statutory construction. The Court reiterated that "Congress is aware of the `distinction between legislation limited to activities "in commerce" and an assertion of its full Commerce Clause power so as to cover all activity substantially affecting interstate commerce.'" Id. at 571 (emphasis added), quoting United States v. American Bldg. Maintenance Industries, 422 U.S. 271, 280 (1975). The Court noted that

> the purpose of [former section 1202(a)] was to proscribe mere possession but that there was some concern about the constitutionality of such a statute. It was that observed ambivalence that made us unwilling in Bass to find the clear intent necessary to conclude that Congress meant to dispense with a nexus requirement entirely. However, we see no indication that Congress intended to require any more than the minimal nexus that the firearm have been, at some time, in interstate commerce.

Scarborough, 431 U.S. at 575. The Court explained that it had decided not to follow dicta in Bass that had suggested that there might be a stricter nexus requirement for possession than for receipt of a firearm. The Court noted that the requirement "would make sense, . . . but that that was not the choice Congress made. Congress was not particularly concerned with the impact on commerce except as a means to insure the constitutionality of [section 1202(a)]." Id. at 575 n.11. Since

42

the government had proven that the firearms that Scarborough had possessed had at some time traveled in interstate commerce, the Court affirmed his conviction.

Bass and Scarborough did not directly address Congressional power under the Commerce Clause, but certain principles are unmistakably inherent in those decisions. In both decisions, the Court did not believe that its construction of former section 1202(a) raised any constitutional concern. Indeed, in Bass the Court believed that its construction saved the statute from possible constitutional infirmity. Second, in Scarborough the Court equated Congress's insertion of the jurisdictional element in former section 1202(a) with fulfillment of the legislature's constitutional obligation to ensure that the statute fell within "its full Commerce Clause power . . . cover[ing] all activity substantially affecting interstate commerce." Scarborough, 431 U.S. at 571 (emphasis added), 575 & n.11. That is, although the Court in Scarborough did not explicate the constitutional underpinnings of its decision, it quite clearly found that a jurisdictional element like that in Scarborough ensured that each conviction had the requisite constitutional nexus with interstate commerce. Had that not been the case, the Court would have had to construe the statute more narrowly, so as to avoid constitutional infirmity if at all possible. See United States v. Five Gambling Devices, 346 U.S. 441, 448 (1953) (plurality opinion) ("The principle is old and deeply imbedded in our jurisprudence that this Court will construe a statute in a manner that requires decision of serious

43

constitutional questions only if the statutory language leaves no reasonable alternative").

In <u>Lopez</u>, the Supreme Court confronted a statute (section 922(q)) similar to former section 1202(a), but without any language requiring that the government prove that the gun possessed in the school zone had been possessed in or affecting commerce. The Court rued this omission, noting that the statute "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." <u>Lopez</u>, 115 S. Ct. at 1631. The Court described <u>Bass</u> as an "example" of a case involving a statute that <u>had</u> such a jurisdictional element, but stated that, "[u]nlike the statute in <u>Bass</u>, § 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." <u>Lopez</u>, 115 S. Ct. at 1631.

Section 2119 <u>has</u> an element that ensures that the <u>motor vehicle</u> involved in the carjacking has "an explicit connection with or effect on interstate commerce" just like the firearms in <u>Bass</u> and <u>Scarborough</u>.[0] In what was likely an attempt to follow

---

[0] The fact that the motor vehicle involved in a carjacking had once been transported, shipped, or received in interstate or foreign commerce provides no less nexus between a carjacking and interstate commerce than the fact that a firearm once traveled in interstate commerce provides with respect to possession of that firearm by a felon. In both cases, the jurisdictional element <u>is not</u> directed at the activity sought to be punished, but rather at an element necessary to the crime but unrelated to the culpable behavior.

44

these decisions -- and particularly Scarborough, which found that jurisdiction was satisfied by the mere proof that the possessed firearm had previously traveled in interstate commerce --Congress required that the government prove that the stolen motor vehicle "had been transported, shipped, or received in interstate or foreign commerce" in order to secure a conviction.

Appellants attempt to escape the implications of Bass and Scarborough by arguing that jurisdictional elements like the one in section 2119 were construed by the Court in Lopez "to require a case-by-case inquiry that the criminal act in question affects interstate commerce."  Bishop Supp. Br. 11.  We do not believe that the Court intended that distinction, however, and we think it unlikely to have done so given the clear statement in Scarborough establishing that the jurisdictional element in former section 1202(a) (the travel of a firearm in interstate commerce) had nothing to do with the wrong sought to be curbed (possession of guns by felons).  Scarborough, 431 U.S. at 572.[0]

---

[0]  We thus reject any attempt to distinguish Scarborough and Bass on the ground that Congress, in enacting the felon-in-possession statute, was "directed ultimately at stopping the interstate trading of weapons which land in the hands of felons." Stokes Supp. Br. 11.  Stokes has no authority for the proposition that Congress, in prohibiting possession of guns by felons, was aiming at the movement of guns towards felons, rather than the possession of guns by felons.  As stated in the text, Scarborough stated quite the opposite.

We also reject Stokes' attempt to distinguish Scarborough on the ground that it dealt with firearms, which are "inherently deadly and dangerous objects" which Congress is empowered to regulate "just as it may regulate any offensive interstate trade."  Stokes Supp. Br. 11.  The dangerousness of the object is not the source of Congressional power; the connection to interstate commerce is.  See generally Lopez, passim.

45

In Scarborough and Bass, the Court found it sufficient for Commerce Clause purposes for Congress to require the government to establish the nexus with interstate commerce by proving a jurisdictional element underlined to the culpable behavior.  Had the Court in Lopez intended to fundamentally change the law and require a closer connection between the jurisdictional element and the culpable conduct, one would have expected it to have been more explicit.[0]

The necessary implication of Bass and Scarborough is that the jurisdictional element in section 2119 independently refutes appellants' arguments that the statute is constitutionally infirm.  We therefore join other courts of appeals in upholding the statute on this ground, as well.  See United States v. Martinez, 49 F.3d 1398, 1401 n.3 (9th Cir. 1995); (relying on Scarborough to uphold the statute); United States v. Johnson, 22 F.3d 106, 108-09 (6th Cir. 1994).

B.

The government also argues that the statute passes constitutional muster under Category Two (to wit, that Congress can regulate instrumentalities of interstate commerce and persons and things in interstate commerce) because motor vehicles are

---

[0] Until that time, we are not at liberty to overrule existing Supreme Court precedent.  As Justice Kennedy explained, "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Rodriguez De Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989).

46

"the quintessential instrumentalities of modern interstate commerce."  Again, we agree.[0]

The Supreme Court has made clear that airplanes, railroads, highways and bridges constitute instrumentalities of interstate commerce which Congress can regulate under the Commerce Clause.  E.g. Lopez, 115 S.Ct. at 1629 (airplanes); Shreveport Rate Cases, 234 U.S. 342 (1914) (railroads); Alstate Constr. Co. v. Durkin, 345 U.S. 13 (1953) (highways); Overstreet v. North Shore Corp., 318 U.S. 125, 129 (1943) (intrastate bridge over navigable waterway).[0]  Congress may regulate threats to these instrumentalities "even though the threat may come only from intrastate activities."  Lopez, 115 S. Ct. at 1629.  Instrumentalities differ from other objects that affect interstate commerce because they are used as a means of

---

[0]     As we have previously noted (supra p. 16), Lopez involved only a regulation that was justified, if at all, under Category Three.  Lopez, 115 S. Ct. at 1630.  As such, Lopez does not affect our analysis here.  See generally United States v. Robertson, 115 S. Ct. 1732 (1995) (noting that "effects" test has no role outside of cases involving intrastate activities that are regulated because of their substantial effects upon interstate commerce).

[0]     The dissent criticizes us for citing to opinions that interpret federal statutory language that Congress included to ensure the statutes did not exceed Congress' Commerce Clause power.  However, the dissent fails to acknowledge that each opinion, in order to decide the statutory question involved, explicitly recognizes the foregoing mediums of transportation to be instrumentalities of interstate commerce.  Moreover, unlike the dissent, we do not believe that the Court would conclude that activities which fell within each statute's jurisdictional language would fall outside of Congress' Commerce Clause power.  If the Court did, it would have overlooked its own command to read statutes narrowly to avoid possible constitutional infirmities whenever possible.  See United States v. Five Gambling Devices, 346 U.S. 441, 448 (1953) (plurality opinion).

47

transporting goods and people across state lines.  Trains and planes are inherently mobile; highways and bridges, though static, are critical to the movement of automobiles.  It would be anomalous, therefore, to recognize these categories of instrumentalities but to suggest that the similarly mobile automobile is not also an instrumentality of interstate commerce.

Notably, none of the instrumentalities we have mentioned are used <u>exclusively</u> as interstate conduits.  Railroads often transport goods between two points within a state, especially in such large states as Pennsylvania, California, Alaska and Texas.  Cessna aircraft fly from Pittsburgh to Philadelphia, never leaving the airspace of Pennsylvania, just as countless flights shuttle daily between Houston and Dallas or Los Angeles and San Francisco.  Highways are used at least as often to travel within states as among them.  Therefore, the fact that automobiles are often used for intrastate travel does not differentiate them from these other instrumentalities.[0]

Stokes argues that "motor vehicles are not inherently instrumentalities of interstate commerce which justify any regulation which involves them in any way.  Rather, they can be regulated as instrumentalities of interstate commerce only when the regulation directs itself to a specific interstate function."

---

[0]     Nor would we find it compelling if we were shown that a greater percentage of railcars or airplanes travel interstate on any given day than the percentage of automobiles that travel interstate on any given day.  To the contrary, we are confident that a far greater volume of people and goods are transported interstate by means of motor vehicles than by railroads or airplanes.

Stokes Supp. Br. 8. The dissent agrees, arguing that Congress could only protect motor vehicles against intrastate threats such as carjacking if the car was traveling in interstate commerce. Dissent at 20.[0] In Southern Ry. Co. v. United States, 222 U.S. 20 (1911), the Supreme Court rejected the same distinction between vehicles that are traveling in interstate commerce and vehicles which, though capable of interstate travel, are traveling intrastate when regulated. In Southern R. Co., the Court recognized that Congress had the power to regulate boxcars that traveled exclusively intrastate because of their inherent mobility and connection to interstate commerce. "[I]t is no objection to such an exertion of [Commerce Clause] power that the dangers intended to be avoided arise, in whole or in part, out of matters connected with intrastate commerce." Id. at 26. Similarly, in the Shreveport Rate Cases, 234 U.S. 342 (1914), the Court recognized Congress' power to regulate rates for completely intrastate rail trips. Finally, in Overstreet v. North Shore Corp., 318 U.S. 125 (1943), the Supreme Court found that a wholly

---

[0] Notably, the dissent points to the language of 18 U.S.C. § 32, which prohibits destruction of civil aircraft "used, operated, or employed in interstate, overseas, or foreign air commerce." This statute does not limit its scope to civil aircraft which are traveling interstate at the time of attack. "Congress intended not only to protect civil aircraft while actually operating in interstate commerce, but also to protect such as is used or employed in interstate commerce, and also the parts, materials and facilities used by such aircraft." United States v. Hume, 453 F.2d 339, 340 (1971) (per curiam) (emphasis added). As § 32 thus reflects, the power to regulate instrumentalities of interstate commerce is the power to regulate vehicles used in interstate commerce, i.e. that have traveled, do travel, or will travel in interstate commerce whether or not they are actually traveling in interstate commerce when regulated.

49

intrastate bridge that connected an island to a road that then connected to an interstate highway was an instrumentality of interstate commerce despite the fact that goods, when they traveled over the bridge, necessarily traveled in intrastate commerce. Thus, Stokes, Bishop, and the dissent mistake Congress' power to regulate instrumentalities as a power to regulate vehicles only when those instrumentalities are being used in interstate commerce when Congress' power, in fact, derives from the objects' status as instrumentalities.

Stokes relies upon United States v. Heightland, 865 F.2d 94 (6th Cir. 1989), which he believes supports his assertion that motor vehicles are instrumentalities of interstate commerce "only in their interstate role." However, in Heightland the Sixth Circuit was addressing whether the assault and murder of a truck driver at a coal mine endangered a motor vehicle "which was used, operated, or employed" in interstate commerce. 18 U.S.C. § 33. That the truck was accosted on an intrastate journey, carrying coal ultimately headed to Virginia, was one factor the court used in determining whether the truck was used in interstate commerce, but the court did not state that an interstate destination was a requirement of the statute or of the Commerce Clause. Id. at 96. To the contrary, the court noted the broad intent of Congress to "vindicat[e] these offenses, which often take place in remote areas where State law enforcement may not be effective." Id., quoting 1984 U.S.C.C.A.N. at 3500). Heightland certainly does not state that

50

motor vehicles are only instrumentalities when bound on interstate journeys.

We are also unpersuaded that intrastate air and rail travel can be regulated as part of a "seamless web" but motor vehicle travel cannot -- i.e., that poorly maintained intrastate boxcars endanger other instrumentalities of interstate commerce while carjacking does not. We recognize, of course, that airspace is limited and requires more careful management to protect interstate commerce. Yet as between boxcars and ordinary cars, the distinction breaks down. A carjacker in Newark does not differentiate between commuters from New York as compared to commuters from Hackensack. A resident from Cherry Hill, New Jersey is just as subject to carjacking in Philadelphia as a resident of Bucks County. In short, the danger which carjacking presents to the use of a motor vehicle as an instrumentality of commerce is presented to both interstate and intrastate drivers, passengers and goods.[0]

As Chief Justice Taft recognized nearly three-quarters of a century ago, the introduction of the automobile ushered in "a radical change in transportation of persons and goods . . . ." Brooks v. United States, 267 U.S. 432 , 438 (1925). In the present age, cars represent Americans' primary mode of

---

[0] The dissent argues that Congress may only regulate vehicles which have been hired to travel across state lines. In doing so, the dissent excludes from interstate commerce all commuters and salespeople who drive across state lines to reach their place of work and their costumers. We do not find such a limitation reasonable or warranted by any precedential authority, nor does the dissent cite any to support its limitation.

transportation, both within and among the States.  See, e.g., Thoms, Amtrak:  Rail Renaissance or Requiem?  49 Chi-Kent L. Rev. 29, 30 (1972) ("The decline of railroad passenger service is a familiar story.  The automobile has replaced all other vehicles as the dominant mode of transportation").  Commuters, salespeople and haulers rely upon motor vehicles daily to maintain the flow of commerce; see also U.S. Bureau of the Census, Statistical Abstract of the United States:  1994 at 622 Table No. 994 (private automobiles accounted for 1,663 billion passenger-miles of intercity passenger traffic in 1992, whereas domestic airways accounted for 367, buses 24, and railroads 14).

As such, we can only conclude that motor vehicles are instrumentalities of interstate commerce.  Thus, Congress may criminalize activities affecting their use even though the wrongful conduct, such as carjacking, occurs wholly intrastate. Because section 2119 is such a regulation, it is constitutional on that basis as well.

C.

Appellants contend that the Supreme Court's Lopez decision is a sharp break with the Court's precedents.  According to them, "the Lopez decision is a strong signal to the lower courts to eschew a casual calculus of whether interstate commerce is substantially implicated in a federal statutory scheme in favor of a carefully considered factual determination."  Bishop Supp. Br. 2.  We, however, do not believe that Lopez calls for federal courts to supplant Congressional judgments with their own.  That would, indeed, be a profound departure from prior law,

and it is important to keep in mind that Justices Kennedy and O'Connor, who fully concurred in the majority opinion, did not view the majority that way.  Rather, Justices Kennedy and O'Connor counseled "great restraint" before a court finds Congress to have overstepped its commerce power, and believed the Court's opinion to have been a "necessary though limited holding."  Lopez, 115 S. Ct. at 1634 (Kennedy, J., concurring).  Thus, despite protestations to the contrary, the winds have not shifted that much.

IV.

For the foregoing reasons, the decision of the district court will be affirmed.

<u>UNITED STATES OF AMERICA v. KEVIN BISHOP, No. 94-5321 and</u>

<u>UNITED STATES OF AMERICA v. EDWARD STOKES, No. 94-5387.</u>
BECKER, <u>Circuit Judge.   Concurring in Part and Dissenting in Part.</u>

Carjacking is a heinous offense -- violent and extremely frightening. Accordingly, I can well understand the anger and frustration that impelled Congress enact 18 U.S.C. § 2119, thereby making carjacking a federal crime.  Nevertheless, I agree with the majority that Congress had the authority to enact this statute under constitutional power "to regulate commerce with foreign Nations, and among the seve States. . . . "  U.S. Const., Art. I, § 8, cl. 3.

Numerous carjackings occur in this country every year, and I acknowledge force of the anecdotal evidence reported by the majority to the effect that at leas carjacked vehicles end up in "chop shops."  Carjacking may therefore be said to contribute, in some degree, to the operation of the interstate car-theft rings that Congress sought to regulate by the Anti-Car-theft Act of 1992, of which § 2119 was A careful reading of this Act's legislative history, however, precludes any misidentification of the concerns that motivated Congress's enactment of this provi Whatever justifications the majority may now proffer, it is clear that Congress ena the carjacking statute as a response to its accurate perception of carjacking as a of violence.  And in the a
bsence of congressional findings to the contrary -- none are in evidence here -- th majority's conclusion that Congress could have rationally believed that prosecuting carjacking was an essential part of dealing with a larger economic burden on inters commerce (i.e., interstate car-theft rings) and that carjacking itself, therefore, substantially affects interstate commerce, borders on gossamer.

2

I do not gainsay that six months ago the majority's opinion would have ca[rried]
the day.  But that was before <u>United States v. Lopez</u>, 115 S. Ct. 1624 (1995), which[,]
fairly read, reflects a sea change in the Supreme Court's approach to these types o[f]
questions.  That view is widely shared by the media in general and the legal press [in]
particular.[0]  In contrast, the majority views <u>Lopez</u> as either a narrow decision or
something of a "sport."  The majority observes, referencing the separate opinions o[f]
Justices O'Connor and Kennedy, that "despite protestations to the contrary, the win[d has]
not shifted that much."  This passage is apparently meant to suggest that Justices
O'Connor and Kennedy form an intermediate bloc which would view <u>Lopez</u> as case-speci[fic. I]
remind my colleagues, however, that both Justices O'Connor and Kennedy <u>joined</u> in th[e Chief]
Justice's opinion.  Since five is more than four, I view <u>Lopez</u> as a beacon that we [must]
follow, and the direction in which the beacon points compels my vote to invalidate [the]
carjacking statute as beyond the broad reach of Congress's Commerce Clause power.

In particular, all five justices in the <u>Lopez</u> majority refused to apply t[he]
Court's previous caselaw "upholding regulations of activities that arise out of or [are]
connected with a commercial transaction, which viewed in the aggregate, substantial[ly]
affects interstate commerce," to "a criminal statute that by its terms has nothing [to do]
with `commerce' or any sort of economic enterprise."  <u>Lopez</u>, 115 S. Ct. at 1630-31. [In so]
doing the Court required "a determination whether an intrastate activity is commerc[ial]

[0]<u>See e.g.</u> Bennett L. Gershman, <u>Judicial "Conservatism"</u>, N.Y. L. J. 2 (June 21, 1995) [("In]
<u>Lopez</u>, the Court may have uprooted nearly 60 years of Commerce Clause jurisprudence[");]
Herman Schwartz, <u>Court Abandons Rational-Basis Test</u>, LEGAL TIMES 25-26 (May 8, 1995) [("The]
imposition of judicial limits on Congress' commerce clause regulation of private
activities thus marks a <u>major</u> shift in judicial attitude." (emphasis added)); Dean [James]
L. Huffman, Lopez <u>Pops Feds Ballooning Powers</u>, NAT'L L. J. A21 (May 22, 1995) ("The
holding, even as cautiously explained by Chief Justice Rehnquist . . . <u>is, as Justi[ce John]</u>
<u>P. Stevens says in dissent, "radical."</u>  There is no other way to reverse nearly 60 [years]
of total deference to Congress on the meaning of the commerce clause." (emphasis ad[ded));]
Stuart Taylor, Jr., <u>Judging with Pinpoint Accuracy</u>, THE RECORDER 10 (May 8, 1995)
(rescribing the comment of Yale Law Professor Bruce Ackerman describing <u>Lopez</u> as "[one of]
the opening cannonades in the coming constitutional revolution").

noncommercial." Id. at 1633. If the intrastate activity is commercial, the "subst

effects" jurisprudence applies, allowing Congress to regulate the activity if it in

aggregate substantially affects interstate commerce; otherwise, the doctrine is

inapplicable and affords Congress no basis for regulation. In spite of Lopez's lim

on the application of its "substantial effects" jurisprudence to intrastate commerc

activity, the majority upholds the constitutionality of § 2119 by concluding that

carjacking, a violent criminal activity, is a commercial transaction. See maj. op.

I disagree with this conclusion, for I read the Lopez Court's reference t

"commercial transaction" as referring to a voluntary economic exchange. I am reinf

in this view by the fact that the majority runs afoul of the Lopez Court's admoniti

any definition of "commercial" must be one that provides "real limits" on the scope

Commerce Clause authority. Lopez, 115 S. Ct. at 1633. Yet, under the majority's b

definition of commercial transaction, Congress could clearly constitutionally feder

all intrastate car-theft, all intrastate crimes of theft, and perhaps nearly all cr

activity occurring within a state. The majority's arguments prove far too much.

Moreover, in the wake of Lopez, I believe that a criminal statute such as

§ 2119, which does not involve a commercial transaction, cannot be upheld as the ma

tries to do -- by piling inference upon inference to construct from anecdotal data

argument that carjacking is an essential part of the operation of car-theft rings.

Rather, non-commercial enactments, such as § 2119, should only be upheld to the ext

that adequate data, available either by way of congressional findings or otherwise,

establishes that the proscribed non-commercial activity has a sufficient relationsh

interstate commercial activity.

Importantly, the Supreme Court recognized in Lopez that "[u]nder our fede

system the administration of criminal justice rests with the States . . . . When C

criminalizes conduct already denounced as criminal by the States, it effects a `cha

4

the sensitive relation between federal and state criminal jurisdiction.'" Lopez, 1

Ct. at 1631 (quoting Brecht v. Abrahamson, 113 S. Ct. 1710, 1720 (1993)) (citations

omitted). In this case, state law already directly governs the defendants' conduc

since New Jersey, like many of it sister states, has criminalized carjacking. In

Similar sentiments are echoed in the recently submitted "Proposed Long Range Plan
Federal Courts":

> Congress should commit itself to conserving the federal courts as a
> distinctive judicial forum of limited jurisdiction in our system of
> federalism. Civil and criminal jurisdiction should be assigned to the
> federal courts only to further clearly defined and justified national
> interests, leaving to the state courts responsibility for adjudicating
> all other matters. . . . In principle, criminal activity should be
> prosecuted in a federal court only in those instances in which state
> court prosecution is not appropriate or where federal interests are
> paramount.

COMMITTEE ON LONG RANGE PLANNING —— JUDICIAL CONFERENCE OF THE UNITED STATES, PROPOSED LONG RANGE PLA
FEDERAL COURTS 23 (March 1995). See also Thomas M. Mengler, "The Sad Refrain of Tough
Crime: Some Thoughts on Saving the Federal Judiciary from the Federalization of Sta
Crime," 43 U. KANSAS L. REV. 503 (1995).

In fact, as the government concedes, the New Jersey criminal penalty exceeds the p
provided by the federal carjacking statute in this case.

See, e.g. CAL. PEN. CODE § 215 (1995); 11 DEL. C. § 222 (1994); D.C. CODE § 22-2903 (1
FLA. STAT. § 812.133 (1994); BURNS IND. CODE ANN. § 35-42-5-2 (1994); LA. REV. STAT. 14:6
(1995); MD. ANN. CODE art. 27, § 348A (1994); MASS. ANN. LAWS ch. 265, § 21A (1995); MI
ANN. § 97-3-117 (1993); SOUTH CAR. CODE ANN. § 16-3-1075 (1993); VA. CODE ANN. § 18.2-58
(1995).

The defendants could be prosecuted under NJ § 2C:15-2, which provides:

> A. CARJACKING DEFINED. A person is guilty of carjacking if in the
> course of committing an unlawful taking of a motor vehicle, as defined
> in N.J.S. 39:1-1, or in an attempt to commit an unlawful taking of a
> motor vehicle he:
> (1) inflicts bodily injury or uses force upon an occupant or person
> in possession or control of a motor vehicle;
> (2) threatens an occupant or person in control with, or purposely
> or knowingly puts an occupant or person in control of the motor
> vehicle in fear of, immediate bodily injury;
> (3) commits or threatens immediately to commit any crime of the
> first or second degree; or
> (4) operates or causes said vehicle to be operated with the person
> who was in possession or control or was an occupant of the motor
> vehicle at the time of the taking remaining in the vehicle. An act
> shall be deemed to be "in the course of committing an unlawful taking

5

enacting this criminal statute, Congress improperly interfered with the primary aut

of New Jersey to define and enforce its criminal code. Intrastate crimes of violenc

the carjacking in this case, are properly left to the states, whose law enforcement

agencies and courts are well suited to handle such criminal activity.[0]

In Part III I will explain in still greater detail why I conclude that th

carjacking statute cannot be justified as substantially affecting interstate commer

But before reaching that issue, I will first take up the points advanced by the gov

as the two primary bases for upholding the carjacking statute, neither of which, I

are sufficient to uphold § 2119 under the Commerce Clause.  First, I examine the

majority's reliance on Scarborough v. United States, 431 U.S. 563, 97 S. Ct. 1963

and demonstrate why the fact that the Dodge Shadow carjacked here once travelled in

interstate commerce is not a sufficient interstate nexus to render this statute

constitutional under the Commerce Clause.  Then, in part II, I explain why § 2119 c

be justified as a regulation of an instrumentality of interstate commerce.  Because

agree with the majority's discussion of the double jeopardy issue, I join in Part I

the majority's opinion, and to that extent this is a concurring as well as dissenti

opinion.

---

of a motor vehicle" if it occurs during an attempt to commit the
unlawful taking of a motor vehicle or during an immediate flight after
the attempt or commission.

B. GRADING. Carjacking is a crime of the first degree and upon
conviction thereof a person may, notwithstanding the provisions of
paragraph (1) of subsection a. of N.J.S. 2C:43-6, be sentenced to an
ordinary term of imprisonment between 10 and 30 years. A person
convicted of carjacking shall be sentenced to a term of imprisonment
and that term of imprisonment shall include the imposition of a
minimum term of at least five years during which the defendant shall
be ineligible for parole.

N.J. Stat. § 2C:15-2 (1994).
[0]Not surprisingly, local, as opposed to federal, law enforcement officials made the
arrests in this case.

6

1.  THE SCARBOROUGH ARGUMENT

        In October of 1992, as a part of the Anti-Car-Theft Act, P.L. 102-519, Co
enacted 18 U.S.C. § 2119, which provides:

>   Whoever, possessing a firearm as defined in section 921 of this title,
>   takes a motor vehicle that has been transported, shipped or received
>   in interstate or foreign commerce from the person or presence of
>   another by force and violence or by intimidation, or attempts to do
>   so, shall be fined under this title or imprisoned . . . .

18 U.S.C.A. § 2119 (West Supp. 1995) (emphasis added).  The majority correctly reco

that this provision differs from § 922(q), the statute involved in Lopez, since § 2

contains a jurisdictional element -- the requirement that the accused "take[] a mot

vehicle that has been transported, shipped or received in interstate or foreign com

-- which § 922(q) lacked.

>   The majority goes on to state that
>        The mere presence of a jurisdictional element, however, does not
>   in and of itself insulate a statute from judicial scrutiny under the
>   Commerce Clause, or render it per se constitutional.  To the contrary,
>   courts must inquire further to determine whether the jurisdictional
>   element has the requisite nexus with interstate commerce.

Following on, it reasons that it:

>   must, therefore, determine whether the jurisdictional component in
>   this case limits the statute to items that have an explicit connection
>   with, or effect upon, interstate commerce.

The court concludes that it does.

        These protestations are laudable, but they stand in sharp contrast to the

discussion that follows which does not support them.  Rather, I believe that the

majority's essential reasoning, like that of  the Ninth Circuit in United State v.

__ F.3d ___, ___ (9th Cir. 1995) [1995 U.S. App. LEXIS 16432], is that the presence

7

this statutory element itself renders § 2119 constitutional,[0] reasoning which suppo

government's contention that <u>Lopez</u> would have been decided differently by the Court

§ 922(q) (which prohibited the possession of a gun within a 1000 feet of a school)

contained a requirement that the gun had at some point been transported in intersta

commerce.

I cannot agree that the force of the <u>Lopez</u> decision is so restricted. Th

because, in order for a particular congressional enactment regulating an intrastate

activity to pass constitutional muster under the Commerce Clause, the enactment mus

fit within one of the three enumerated categories of congressional power. The

jurisdictional element in such cases functions only to <u>narrow the class of regulate</u>

<u>activity</u>. As the Court in <u>Lopez</u> recognized, in distinguishing prior case law, § 92

"contains no jurisdictional element which would <u>ensure</u>, through case-by-case inqui

the [regulated conduct] affects interstate commerce." <u>Lopez</u>, 115 S. Ct. at 1631 (e

added). In other words, a jurisdictional element functions only to limit the regul

to interstate activity <u>or</u> to ensure that the intrastate activity which is regulated

satisfies one of the three tests of congressional power. Section 2119 fails in thi

regard, since this provision regulates intrastate activity[0] and the jurisdictional

---

[0]While the majority does not address the subject, I will assume that this jurisdict
element requires the government to establish that "a fully assembled `motor vehicle
been transported in interstate commerce rather than . . . [merely requiring a showi
that] either the `motor vehicle' or the motor vehicle's <u>parts</u>, prior to assembly, n
interstate commerce." <u>United States v. Johnson</u>, 56 F.3d 947, 956-57 (8th Cir. 1995
[0]In this regard, § 2119's jurisdictional requirement is distinguishable from a requ
that the regulated entity actually be "engaged in interstate commerce." <u>See</u> United
v. Robertson, 115 S. Ct. 1732, 1732-33 (1995) (per curiam) (examining the question
a regulated entity was "engaged in interstate commerce"). If § 2119 contained such
requirement, the government would need to establish that the defendants were in fac
working as a part of a car-theft ring engaged in interstate commerce. While such a
requirement would render § 2119 constitutional, the statute, as enacted, simply lac
requirement that the regulated person(s) be engaged in interstate commerce.

8

in no way limits the statute's application to ensure that it fits within one of the branches of congressional Commerce Clause authority.

The majority, like the Oliver court, simply offers no analysis as to how § 2119's jurisdictional element limits, in any relevant manner, the crime of carjac that it fits within one of the three enumerated branches of congressional authority. Rather, both opinions rely on the decision of the Supreme Court in Scarborough v. U States, 431 U.S. 563, 97 S. Ct. 1963 (1977), which the majority candidly admits did engage in any analysis of the authority of Congress to enact laws under the Commerc Clause. [0]

As the majority recognizes, the Scarborough decision expanded upon the Co prior opinion in United States v. Bass, 404 U.S. 336, 92 S. Ct. 515 (1971), which, Scarborough, involved what was then § 1202(a) of Title 18. This provision provided any convicted felon "who receives, possesses, or transports in commerce or affectin commerce . . . any firearm shall be fined not more than $10,000 or imprisoned for n than two years, or both." In Bass, the "Government proceeded on the assumption tha § 1202(a)(1) banned all possessions and receipts of firearms by convicted felons, a no connection with interstate commerce had to be demonstrated in individual cases.' 404 U.S. at 338, 92 S. Ct. at 517. In response to this argument, the defendant con that "the statute did not reach possession of a firearm not shown to have been `in commerce or affecting commerce,' and that, if it did, Congress had overstepped its constitutional powers under the Commerce Clause." Bass, 404 U.S. at 338, 92 S. Ct.

---

[0] Indeed the majority summarily concludes:

> Because section 2119 is limited to cars that have traveled in interstate or foreign commerce, the Supreme Court's decisions in Bass and Scarborough compel the conclusion that the jurisdictional element in section 2119 provides a nexus sufficient to protect the statute from constitutional infirmity.

The Court rejected the government's interpretation of the statute, refus[ing] adopt the government's "broad reading in the absence of a clearer direction from Congress," because the statute's "sanctions are criminal and because, under the Government's broader reading, the statute would mark a major inroad into a domain traditionally left to the States."  Id. at 339, 92 S. Ct. at 518.  Therefore, the C[ourt] concluded that "the commerce requirement in § 1202(a) must be read as part of the `possesses' and `receives' offenses."  Id. at 350, 92 S. Ct. at 524; id. ("Absent a[ny] clearer statement of intention from Congress than is present here, we do not interp[ret] § 1202(a) to reach the `mere possession' of firearms.").  The Court reasoned that "[a]bsent proof of some interstate commerce nexus in each case, § 1202(a) dramatica[lly] intrudes upon traditional state criminal jurisdiction."  Id.  Because the governmen[t had] not proven even the minimal nexus that the Court held the statute to require, the C[ourt] overturned the conviction, and thus "d[id] not reach the question whether, upon appropriate findings, Congress can constitutionally punish the `mere possession' of firearms."  Id. at 339 n.4, 92 S. Ct. at 518 n.4.

Following Bass, the Court confronted in Scarborough the question of how t[he] government might satisfy its statutory burden under the Bass Court's reading of the statute, which required that a defendant possess the weapon "in commerce or affect[ing] commerce."[0]  Through a careful parsing of § 1202(a)'s legislative history, the Cour[t] concluded that in order to be convicted under the statute, the government need only [show] that "the firearm possessed by the convicted felon traveled at some time in interst[ate] commerce."  Scarborough, 431 U.S. at 568, 97 S. Ct. at 1966.

---

[0]In Bass, the Court noted, by way of example, that the government could satisfy thi[s] burden under the statute, "if at the time of the offense the gun was moving interst[ate] on an interstate facility, or if the possession affects commerce." Bass, 404 U.S. a[t 350,] 92 S. Ct. at 524.

That decision, as the majority concedes, was exclusively one of statutory

construction, explicating the intent of Congress in enacting § 1202(a).  The Court'

entire analysis focused on this issue of congressional intent -- what Congress requ

the phrase "in commerce or affecting commerce." Noticeably absent from the opinion,

majority recognizes, is any analysis of whether the activity regulated by the statu

constitutes a constitutional exercise of congressional power under the Commerce Cla

Given this fact, the relevance of the Scarborough decision to Commerce Clause

jurisprudence is dubious.[0]  I agree that the Commerce Clause issue was implicit in

result reached by the Scarborough Court, which upheld the conviction.[0]  However, th

majority errs in relying on a putative holding of Scarborough (perhaps "phantom hol

might be more apt) to conclude that the interstate jurisdiction element renders the

statute constitutional under the Commerce Clause.[0]

---

[0]The Lopez Court observed that "[u]nlike the statute in Bass, § 922(q) has no expre
jurisdictional element which might limit its reach to a discrete set of firearm
possessions that additionally have an explicit connection with or effect on interst
commerce."  Lopez, 115 S. Ct. at 1631 (emphasis added).  This statement is consiste
the requirement that the jurisdictional element limit the regulation to interstate
activity or ensure that the regulated intrastate activity fall within one of three
categories of congressional power under the Commerce Clause.

[0]I do note that though the Commerce Clause issue easily could have been mentioned,
not.

[0]Notwithstanding the fact that the Court's decision in Scarborough was devoid of an
Commerce Clause analysis, the majority supports its unflinching application in this
by relying on language in Rodriguez de Quijas v. Shearson/American Express, Inc., 4
477, 109 S. Ct. 1917 (1989), where the Court cautioned: "If a precedent of this Cou
direct application in a case, yet appears to rest on reasons rejected in some other
of decisions, the Court of Appeals should follow the case which directly controls,
to this Court the prerogative of overruling its own decisions."  490 U.S. at 484, 1
Ct. at 1921-22 (emphasis added).  In Rodriguez, the Court of Appeals had concluded
predispute agreement to arbitrate claims under the Securities Act of 1933" was
enforceable, and did not "requir[e] resolution of the claims . . . in a judicial fo
despite that fact that previously in Wilko v. Swan, 346 U.S. 427, 74 S. Ct. 182 (19
the Supreme Court had held that "an agreement to arbitrate future controversies" un
Securities Act of 1933 was "void" under § 14 of that Act.  Rodriguez, 490 U.S. at 4
S. Ct. at 1919.  The Court of Appeals had reasoned that while subsequent Supreme Co
decisions had not directly addressed the holding of Wilko, which was directly appli
subsequent decisions had reduced Wilko to "obsolescence."  Rodriguez de Quijas v.

11

Even if it were proper to rely on Scarborough as Commerce Clause preceden[t], majority errs, in my view, in defining the scope of Scarborough's putative Commerce [Clause] holding as broadly as it does, because § 1202(a) is distinguishable from § 2119.  S[ection] § 1202(a)'s jurisdictional requirement could, more properly, be viewed as a rationa[l] restriction on the illegal interstate trade in guns pursuant to the first branch of Congress's Commerce Clause authority, the well established "authority of Congress t[o keep] the channels of interstate commerce free from immoral and injurious uses . . . ." I[d.,] 115 S. Ct. at 1629 (quoting Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 256, 85 S. Ct. 348, 357 (1964)). At the time of the enactment of § 1202(a), federal [law] prohibited the sale of guns to felons.  See 18 U.S.C. § 922(d) (1976) (providing th[at it] shall be unlawful for a licensed gun distributor to sell or give a firearm to a per[son] under indictment for or convicted of a crime punishable by imprisonment for a term [not] exceeding one year).  A fortiori, felons who had purchased their weapons after thei[r] felony conviction would have done so through illegal channels.  Accordingly, § 120[2(a),] which prohibited felons from possessing a gun that traveled in interstate commerce, [would] have constituted a rational means for Congress to deal with illegal interstate traf[fic] in guns.

Section 2119, in contrast, cannot be justified in this fashion.  Its jurisdictional element limits the reach of the carjacking statute to automobiles th[at] legitimately traveled in interstate commerce.  But, we cannot rationally conclude t[hat]

Shearson/Lehman Bros., Inc., 845 F.2d 1296, 1299 (5th Cir. 1988).    While I ackno[wledge] the binding nature of this decision, it is clearly distinguishable. Scarborough, a [1977] decision analyzing the legislative intent surrounding the enactment of § 1202(a) (a [federal] statute since repealed by Congress) and devoid of any Commerce Clause analysis, sim[ply] cannot have "direct application" in a case concerning the power of Congress to enac[t a] federal carjacking statute under its Commerce Clause power. Moreover, while the bro[ad] application of the statute in Scarborough is probably undermined by Lopez, my conte[ntion] that Scarborough is inapplicable to this action does not arise from the Court's de[cision] in Lopez.

12

Congress seeks to regulate legitimate interstate trade in automobiles from manufac[t]

dealer or from dealer to victim. Rather, § 2119 extends solely to intrastate crimin[al]

activity, which bears no rational nexus to the fact that the automobile in question [at]

some point legitimately shipped interstate. Hence, the jurisdictional element does [not]

any way rationally limit the class of activity Congress seeks to regulate.  The con[cerns]

motivating Congress to enact § 2119 are the same whether the automobile was manufac[tured]

within the state where the crime occurred or elsewhere.[0]

       The reasoning of the majority and the <u>Oliver</u> court, which would essential[ly]

permit Congress to regulate any activity so long as the statute contains some inter[state]

jurisdictional element (no matter how tenuous its relation to the regulated activit[y]),

simply too broad.  The majority's holding effectively renders the Supreme Court's t[hree]

part Commerce Clause analysis superfluous, and permits Congress, through the inclus[ion of]

a meaningless interstate commerce provision, to "convert congressional authority un[der the]

Commerce Clause to a general police power of the sort retained by the States."  <u>Lop[ez, 115]</u>

S. Ct. at 1634.  For instance, the majority's logic would permit a federal law outl[awing]

the theft of a Hershey kiss from a corner store in Youngstown, Ohio by a neighborho[od]

juvenile on the basis that the candy once traveled in interstate commerce to the st[ore]

from Hershey, Pennsylvania.  Similarly, the majority's broad reading would vest Con[gress]

with power under the Commerce Clause to enact a federal law requiring students in p[ublic]

schools to read their homework assignments, so long as the government establishes t[hat]

_____

[0]The improvidence of the majority's reliance on the jurisdictional requirement is
demonstrated by the fact that Congress, in enacting § 2119, expressed concern that [in a]
single week last year in Detroit, 74 cars were stolen in armed carjackings."  H.R. [Rep. No.]
851, 102d Cong., 2d Sess., pt. 1, at 15, 1992 U.S.C.C.A.N. 2829, 2831.  It defies l[ogic to]
assert that Congress rationally sought to criminalize only those carjackings occurr[ing in]
Detroit which involved these relatively few cars in Michigan manufactured outside o[f the]
state.

textbooks were published in another state.[0]  The majority's reasoning destroys any "distinction between what is truly national and what is truly local."  Lopez, 115 S at 1634.[0]

Accordingly, I conclude that § 2119 would constitute a constitutional exe of congressional authority only if the intrastate activity regulated fit within one "three broad categories of activity that Congress may regulate under its commerce p Lopez at 1629.  In upholding this conviction, the majority relies on two of these t categories, concluding that § 2119 is constitutional under Congress's power (1) to "regulate and protect the instrumentalities of interstate commerce," and (2) to reg those activities with a "substantial effect on interstate commerce."  Lopez, 115 S. 1629-30.  I take both of these rationales up in turn.

2.  INSTRUMENTALITIES OF INTERSTATE COMMERCE

Despite the fact that § 2119 does not govern the use of automobiles as instrumentalities of interstate commerce, the majority, again joining the Ninth Cir Oliver, __ F.3d at ___, upholds the constitutionality of the statute on the theory

_____

[0]See Paul D. Kamenar, The Feds Lose a Piece of Their Rock; Commerce Clause Should N Infinite, LEGAL TIMES 25 (May 3, 1995) (recounting the criticism of commentator Georg that under the Lopez dissent's broad reading of Commerce Clause authority, Congress "pass a federal law requiring students to do their homework").

[0]In overturning § 2119 as beyond the scope of Congress's Commerce Clause authority United States v. Cortner, 834 F. Supp. 242 (M.D. Tenn. 1993), rev'd 30 F.3d 135 (6t 1994), Judge Wiseman had a similar view of this argument:

> To say . . . that because something once traveled in interstate
> commerce it remains in interstate commerce after coming to rest in a
> given state is sheer sophistry. . . . [I]f it is sufficient to invoke
> the powers of the Commerce Clause that something has been manufactured
> outside of the state of Tennessee and previously transported here, 90%
> of the merchandise on every merchant's shelf will qualify and any
> robbery of any store can be federalized by the Congress under this
> rationale.

Id. at 243.

automobiles often are used as instrumentalities of interstate commerce.  In so doi[ng]

majority dramatically expands the scope of Congress's power under this branch of Co[mmerce]

Clause authority.

The majority correctly recognizes that "Congress is empowered to regulate

protect the instrumentalities of interstate commerce, or persons or things in inter[state]

commerce, even though the threat may come only from intrastate activities." Lopez,

Ct. at 1629.  However, in crafting the scope of this category of congressional auth[ority,]

courts have, to date, appropriately limited its application to congressional regula[tion of]

instrumentalities actually engaged in interstate commerce, or objects such as rail[road cars and]

railway bridges, which are integrally related to an interstate commerce network.  W[hile]

automobiles can indeed be used to engage in interstate commerce (and an automobile [need]

not be travelling interstate to be used in interstate commerce), the federal carja[cking]

statute, unlike those statutes upheld in prior cases, in no way regulates

instrumentalities in any way engaged in interstate commerce. Rather, § 2119 is a cr[iminal]

statute of general application, which, by its terms, lacks any nexus to the use of

automobiles in interstate commerce.

In my view, congressional authority under this branch of its Commerce Cla[use]

power has been shaped by two cases, cited by the Supreme Court in Lopez –– Southern [R.R.]

Railroad Co. v. United States, 222 U.S. 20, 32 S. Ct. 2 (1911) and Shreveport Rate [Case,]

234 U.S. 342, 34 S. Ct. 833 (1914) –– and by a statement in dicta in Perez v. Unite[d]

States, 402 U.S. 146, 150, 91 S. Ct. 1357, 1359 (1971) (Perez was a "substantial ef[fects"]

decision, see discussion infra).

The first of these cases, Southern R.R., involved the application of the [Safety]

Appliance Act to a non-conforming railroad car used solely for hauling within one s[tate]

on "`a part of a through highway' over which traffic was continually being moved fr[om one]

State to another."  222 U.S. at 23, 32 S. Ct. at 3.  The Court upheld the applicati[on]

15

the regulation to the intrastate railcars, since such a close relationship existed

the intra- and inter- state traffic that congressional power could be "exerted to s

the safety of the persons and property transported" in interstate commerce, even th

the "dangers intended to be avoided arise, in whole or in part, out of matters conn

with intrastate commerce." Id. at 27, 32 S. Ct. at 4.

Similarly, in the Shreveport Rate Cases, the Court upheld the ICC's abili

regulate the "relation" between inter- and intra- state rail rates by requiring an

increase in the price of the intra-state rate. In both these cases the Court was

concerned with the regulation of "intrastate transactions of interstate carriers".

Shreveport Rate Cases, 234 U.S. at 353, 34 S. Ct. at 837 (emphasis supplied). Give

caselaw, the majority's conclusion that § 2119 constitutes a regulation of an

instrumentality of interstate commerce because cars can be used as instrumentalitie

interstate commerce dramatically extends congressional power under this category of

authority.

The Supreme Court's discussion in Perez v. United States, 402 U.S. at 150

Ct. at 1359, is not to the contrary. In Perez, the Court recognized that Congress

protect the "instrumentalities of interstate commerce, as for example, the destruct

an aircraft (18 U.S.C. § 32)." Id. at 150, 91 S. Ct. at 359. At the time of Perez

provided a criminal penalty for "[w]hoever willfully sets fire to, damages . . . ar

aircraft used, operated, or employed in interstate, overseas, or foreign air commer

While the majority correctly recognizes that motor vehicles are often used as

instrumentalities of interstate commerce (e.g., commercial trucking, interstate bus

services, travelling salespeople, and even perhaps commuters), § 2119, unlike 18 U.

§ 32, does not involve the protection of an item used as an instrumentality of inte

16

commerce.[0]  If § 2119 were limited, like § 32, to the carjacking of automobiles "en[...] in interstate commerce," this statute would indeed proscribe interference with an i[...] being used as an instrumentality of interstate commerce, which Congress could prope[...] regulate under this branch of Commerce Clause authority.  However, § 2119's scope i[...] dramatically broader, given that it governs all automobiles (regardless of their [...] connection to interstate commerce) including those, like the one involved in this c[...] which are clearly not being used as instrumentalities of interstate commerce.

It is enough for the majority that intrastate carjacking threatens both i[...] and out-of-state motorists. But to reiterate, this is not the proper focus under th[...] prong of Commerce Clause analysis.  In regulating under this branch of authority, C[...] can protect instrumentalities of interstate commerce.  The fact that a motorist fr[...] Cherry Hill, New Jersey, is subject to a risk of carjacking in Philadelphia, does [...] convert this motorist's automobile into an instrumentality of interstate commerce [...] equivalent to a commercial train or airplane transporting passengers and goods bot[...] and intra-state.[0]        The regulation of air and rail travel is simply not a vali[...] analogy.  Such federal regulation is proper since both airplanes and trains are, ne[...] exclusively, used as instrumentalities of interstate commerce -- that is, air and r[...] travel involves, overwhelmingly, the sale of both inter- and intra-state transporta[...]

---

[0] The majority recognizes this important distinction between the carjacking statute [...] U.S.C. § 32 in dismissing Stokes' reliance on United States v. Heightland, 865 F.2d [...] (6th Cir. 1989).  See maj. op. at 49.

[0] In Cortner, Judge Wiseman recognized that,

> [i]f anything that will take you across a state line is an
> "instrumentality of commerce," then there is justification for
> Congress to regulate anything done on a bicycle or, for that matter,
> on foot.  The Framers traveled to Philadelphia on horseback or by
> horse and carriage.  Can it be imagined that in constructing the
> Commerce Clause they intended to regulate and punish horse stealing?

834 F. Supp. at 243.

17

services for persons and/or cargo.[0] We do not deal here with the ability of Congres

regulate or protect intra- and inter-state bus or commercial truck travel. Such reg

is clearly proper, since it, in contrast to § 2119, would involve the regulation of

instrumentalities of interstate commerce. Rather, we deal here with a regulation

governing all automobiles in all instances.

In reaching its conclusion, the majority misreads the scope of existing S

Court precedent. Foremost, its reliance on <u>Alstate Const. Co. v. Durkin</u>, 345 U.S.

S. Ct. 565 (1953) and <u>Overstreet v. North Shore Corp.</u>, 318 U.S. 125, 63 S. Ct. 494

is simply misplaced. These cases address the question whether, pursuant to a <u>statu</u>

regulating an entity "engaged in interstate commerce," the regulated entity in fact

within this statutory requirement. As the Court explained, <u>Overstreet</u> was
> another case in which we must define the scope of the Fair Labor
> Standards Act. The precise question is whether petitioners, who are
> engaged in maintaining or operating a toll road and a drawbridge over
> a navigable waterway which together constitute a medium for the
> interstate movement of goods and persons, are "engaged in commerce"
> within the meaning of §§ 6 and 7 of the Act, . . . [where] "commerce"
> [is defined as] "commerce . . . among the several States."

318 U.S. at 126 & n.2, 63 S. Ct. at 495-96 & n.2 (footnote and citations omitted).

Court concluded that they were.

<u>Alstate</u> was a similar case. Alstate was a road contractor which also

manufactured a road surfacing material. Most of its work was to install the materia

railroads and interstate roads. The Court observed that:

---

[0]To the extent that federal aviation regulation governs non-commercial aircraft, a
distinction from the regulation of automobiles remains, given that the use of non-
commercial airplanes dramatically implicates the safety of interstate commercial ai
travel, which depends on the regulation of <u>all</u> planes using our nation's air space
manner not present in the regulation of automobiles. <u>See</u> <u>Northwest Airlines v. Min</u>
322 U.S. 292, 303, 64 S. Ct. 950, 956 (1944) (Jackson, J., concurring) ("Air as an
in which to navigate is even more inevitably federalized by the commerce clause tha
navigable water. . . . Congress has recognized the national responsibility for reg
air commerce. Federal control is intensive and exclusive.").

18

> he who serves interstate highways and railroads serves commerce.  By
> the same token he who produces goods for these indispensable and
> inseparable parts of commerce produces goods for commerce.  We
> therefore conclude that Alstate's off-the-road employees were covered
> by the Fair Labor Standards Act because engaged in "production of
> goods for commerce."

As the Supreme Court once again clarified in <u>United States v. Robertson</u>,

Ct. 1732, 1732-33 (1995) (per curiam), the question whether an entity is "engaged i

interstate commerce" under an applicable statute is a question quite different from

whether a statute, <u>lacking any such requirement</u>, otherwise falls within Congress's

Commerce Clause authority.  <u>See</u> <u>Gulf Oil Corp. v. Copp Paving Co.</u>, 419 U.S. 186, 19

95 S. Ct. 392, 399 n.12 (1974) ("The jurisdictional inquiry under [a statute], turn

it does on the circumstances presented in each case and requiring a particularized

judicial determination, differs <u>significantly</u> from that required when Congress itse

defined the specific persons and activities that affect commerce and therefore requ

federal regulation." (emphasis added)).

The Court in <u>Overstreet</u> did bolster its conclusion that the bridge operat

engaged in interstate commerce by the fact that it operated a bridge which "constit

a medium for the interstate movement of goods and persons."  <u>Overstreet</u>, 318 U.S. a

63 S. Ct. at 496.  However, the application of the statute to the entities in both

<u>Overstreet</u> and <u>Alstate</u> rested first and foremost on the Court's statutory conclusi

the business was "engaged in interstate commerce."  <u>Id.</u>, <u>Alstate</u>, 345 U.S. at 15-16

S. Ct. at 567.

In sum, the majority and the <u>Oliver</u> court reason that because cars are so

used as instrumentalities of interstate commerce, Congress can regulate <u>any</u> aspect

automobiles (and automobile traffic) under this branch of congressional authority.

Federal power under the Commerce Clause, in my view, is not this broad.  The fact t

automobiles can be used as instrumentalities of interstate commerce does not grant

19

Congress plenary authority to regulate the use and operation of every individual's

automobile.  Such an approach would constitute a dramatic encroachment on the regul

of automobiles, a traditional area of state concern, and would permit Congress to p

federal laws requiring individuals to wear seatbelts (as opposed to requiring that

manufactured with seatbelts) or banning motorists from making a right turn at a rec

light.[0]  Previous Commerce Clause jurisprudence has never before viewed congression

power to regulate the instrumentalities of interstate commerce this broadly.  With

decision, the majority dramatically and improperly enhances the scope of federal po

under this branch of Congress's Commerce Clause authority.

3.  SUBSTANTIAL EFFECT ON INTERSTATE COMMERCE

The majority's principal justification in upholding the constitutionality

§ 2119 is that Congress could have rationally concluded that carjacking has a subst

effect on interstate commerce.  In its discussion, the majority does an excellent j

recounting the congressional findings with regard to the entire Anti-Car-Theft Act.

maj. op. at 21-23. However, by recounting this legislative history, the majority co

the relevant issues.  We do not deal here with the constitutionality of this entire

with the effect of car-theft rings, in the whole, on the economy.  Rather, our conc

with whether Congress could have rationally concluded that carjacking substantially

affects interstate commerce through its role in interstate car-theft operations.

---

[0]I note in this regard that existing federal automobile regulation of this genre (i
the federal speed limit) has been exerted under the Spending Clause, not the Commer
Clause.  See 23 U.S.C. § 154 (Supp. 1995) (conditioning receipt of federal highway
on a state's enforcement of federally-imposed speed limits).  It has long been reco
that "`the power of Congress to authorize expenditure of public moneys for public p
is not limited by the direct grants of legislative power found in the Constitution.
South Dakota v. Dole, 483 U.S. 203, 207, 107 S. Ct. 2793, 2796 (1987) (quoting Unit
States v. Butler, 297 U.S. 1, 66 (1936)).

Section 2119's legislative history is devoid of any findings in this rega

which should come as no surprise, since in enacting this provision Congress was cor

not with the economic effects of carjacking or with the relationship between carjac

and interstate car-theft operations, but rather with curtailing this well-publicize

of violence. This intent is abundantly clear from the legislative history cited by

majority: "In addition to economic costs, car owners are increasingly subject to vi

crime. The most recent developments in car-theft is `armed carjacking.'" H.R. REP

102-851, 102d Cong., 2d Sess., pt. 1, at 15 (1992), reprinted in 1992 U.S.C.C.A.N.

2831 (emphasis added); id., pt. 3, at 2, 1992 U.S.C.C.A.N. at 2895 ("Perhaps relati

the opportunity for profit, criminals are increasingly committing violent crime in

form of `armed carjacking.'"); see also 138 CONG. REC. H11,819 (1992) (statement of

Ramstad) ("People are outraged and terrified by the heinous carjacking epidemic cu

upon us. How can any civilized nation tolerate the brutal killing of a mother drag

miles to her death . . . ? How can any civilized people tolerate such despicable,

outrageous criminal acts? They cannot and they will not."); id. at H11,820 (statem

Rep. Collins) ("The most shocking case, involv[ing] a young mother who was dragged

miles to her death . . . has absolutely galvanized public opinion and outcry that t

Congress act now to address this awesome despicable crime.").

Given this legislative history, it is clear that § 2119 was enacted to de

carjacking as a crime of violence, not, as the majority now contends, to confront t

effects of carjacking on the interstate economy. Congress has not made any finding

support the conclusion that carjacking has a substantial effect on interstate comme

Congress made no such findings since, as the majority surmises, maj. op. at 42, Cor

viewed § 2119's jurisdictional requirement, discussed supra at 7-16, as constitutio

sufficient. I recognize that "Congress need [not] make particularized findings in

to legislate." Perez, 402 U.S. at 156, 91 S. Ct. at 1362 (cited in Lopez, 115 S. C

21

1631 ("Congress is normally not required to make formal findings as to the substant

burdens that an activity has on interstate commerce.")). Accordingly, I point to t

of congressional findings only to demonstrate, that like the statute in Lopez, no s

findings are available to support the government's contention that the intrastate a

has a substantial effect on commerce. See Lopez, 115 S. Ct. at 1630-32 ("[T]o the

that congressional findings would enable us to evaluate the legislative judgment th

activity in question substantially affected interstate commerce, even though no su

substantial effect was visible to the naked eye, they are lacking here.").

Given the lack of congressional findings, the majority constructs for Con

an argument that carjacking has a substantial effect on interstate commerce. The

majority's argument is essentially two-fold; it contends: (1) that carjacking, itse

a commercial transaction which, in the aggregate, substantially affects interstate

commerce; or (2) that Congress could have rationally concluded that § 2119 was a ne

element in thwarting the operation of car-theft rings, which Congress found to

substantially affect interstate commerce.

In the first instance, the majority submits that carjacking can be upheld

regulation of an intrastate commercial transaction which, through repetition, has a

substantial effect on interstate commerce. Maj. op. at 26-27 & n.20 (citing Hodel

Indiana, 452 U.S. 314, 325 (1981)). In so doing, the majority runs afoul of Lopez.

Importantly, the Court in Lopez concluded that the regulation of non-econ

intrastate activity could not be upheld under its cases dealing with the "regulatio

activities that arise out of or are connected with a commercial transaction, which

in the aggregate, substantially affects interstate commerce." Lopez, 115 S. Ct. at

In limiting the application of its "substantial effects" jurisprudence to intrastat

economic or commercial activity, the Court recognized that its prior caselaw in thi

satisfied this limitation:

22

> we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce. Examples include the regulation of intrastate coal mining; Hodel, supra, intrastate extortionate credit transactions, Perez, supra, restaurants utilizing substantial interstate supplies, McClung, supra, inns and hotels catering to interstate guests, Heart of Atlanta Motel, supra, and production and consumption of home-grown wheat, Wickard v. Filburn, 317 U.S. 111, 63 S. Ct. 82, 87 L. Ed. 122 (1942). These examples are by no means exhaustive, but the pattern is clear. Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.

Lopez, 115 S. Ct. at 1630.

In articulating this important limitation on its Commerce Clause jurispru[...] the Lopez court "admitted[] [that] a determination whether an intrastate activity i[...] commercial or noncommercial may in some cases result in legal uncertainty." Id. at [...] But the Court recognized that "so long as Congress' authority is limited to those p[...] enumerated in the Constitution, and so long as those enumerated powers are interpre[...] having judicially enforceable outer limits, congressional legislation under the Com[...] Clause always will engender `legal uncertainty.'" Id. Following Lopez, the Court [...] United States v. Robertson reiterated this new important limitation on its substant[...] effects jurisprudence: "The `affecting commerce' test was developed in our jurispru[...] to define the extent of Congress's power over purely intrastate commercial activiti[...] nonetheless have substantial interstate effects." 115 S. Ct. at 1733 (emphasis add[...]

The majority concludes that the Court's limitation of its substantial eff[...] jurisprudence to intrastate commercial or economic activity does not preclude appli[...] of the doctrine to § 2119 since, in the majority's view, carjacking is a commercial[...] transaction. In reaching this conclusion, the majority's analysis evidences none o[...] "legal uncertainty" that concerned the Court in Lopez, 115 S. Ct. at 1633, since it [...] sufficient for the majority that "[w]hen a criminal points a gun at a victim and ta[...] or her car, the criminal has made an economic gain and the victim has suffered an [...]

23

undeniable substantial loss." Maj. op. at 27. The majority then attempts to measu

"economic effect" of carjacking by concluding that it is equivalent to the sum of t

value of all carjacked automobiles. See maj. op. at 32 n. 20. In my view, the maj

definition of commercial transaction is too broad and thereby runs afoul of the Lop

Court's requirement that the definition of "commercial" provide "real limits" on th

of Commerce Clause authority. 115 S. Ct. at 1633 (rejecting the primary dissent's

contention that "Congress could rationally conclude that schools fall on the commer

side of the line," on the grounds that such a "rationale lacks any real limits beca

depending on the level of generality, any activity can be looked upon as commercial

The majority sweeps within its definition of commercial activity all crim

acts which involve a coercive (non-consensual) transfer of economic benefit from vi

perpetrator. A definition of this breadth would not only include carjacking, but a

would clearly include all crimes of theft. Indeed, if Chief Judge Posner is correc

perhaps it includes all criminal activity. See RICHARD A. POSNER, ECONOMIC ANALYSIS OF LA

18 (4th ed. 1992) (contending that "[m]urder, robbery, burglary, larceny, rape, ass

and battery, mayhem, false pretenses, and most other common law crimes (i.e., crime

punishable under the English common law)" all "represent a pure coercive transfer e

of wealth or utility from victim to wrongdoer"). While I concede that it is far fr

clear what the Court meant in Lopez by a "commercial transaction," I submit that th

preferable definition of commercial transaction requires an activity involving a vo

economic exchange.[0] To define a commercial transaction as broadly as the majority

any activity involving a transfer of wealth from victim to wrongdoer -- is to embra

---

[0]The Court's decision in Wickard v. Filburn, 317 U.S. 111, 63 S. Ct. 82 (1942), "pe
the most far reaching example of Commerce Clause authority over intrastate activity
Lopez, 115 S. Ct. at 1630, is not to the contrary. Wickard dealt with the producti
consumption of home grown wheat, an activity that undeniably bears a connection wit
voluntary economic exchange -- the need vel non of the regulated entity (the farmer
purchase wheat in the market place. See Wickard, 63 S. Ct. at 84, 90-91.

Commerce Clause jurisprudence that includes within its scope a broad array of crimi

activity, which "[u]nder our federal system, the States possess primary authority f

defining and enforcing . . . ."  Lopez, 115 S. Ct. at 1630-31 (internal quotation m

omitted).

The majority's second "substantial effects" argument is somewhat distinct

its first.  It contends that Congress could have rationally concluded that carjacki

"an essential part of a larger regulation of economic activity, in which the regula

scheme could be undercut unless the intrastate activity were regulated."  Id. at 16

the majority's view, Congress could have concluded that criminalizing carjacking wa

essential part of the regulation of car-theft rings, which are interstate commercia

enterprises that Congress found to have a substantial effect on interstate commerce

Given the lack of congressional findings on the nexus between carjacking

car-theft rings, the majority constructs its argument from anecdotal evidence drawn

newspaper reports suggesting that some carjackers have sold automobiles into car-th

rings.  In addition, the majority relies on police reports and some statements by

congressmen that suggest that modern anti-theft devices have made it easier to carj

many vehicles than to steal them when they are parked.  The majority also relies on

Department of Justice Report on carjacking.  See An Analysis of Carjacking in the U

States (Oct. 14, 1992).  Such reliance is misplaced, given that the thrust of this

directly undercuts the majority's contention that carjacking forms a part of the op

of car theft rings.

After discussing car theft rings (i.e., chop shops, salvage switching of

identification numbers, exportation, and insurance fraud), the report states:

> In each of the above instances, there was relatively little
> danger to the American public as the sole motive was to obtain the
> vehicle for its value.  In contrast, the new carjacking problem is
> more akin to the violent street crimes associated with street gangs
> and the drug subculture. . . .

25

The primary motives appear to be transportation for a getaway after robbing the driver, a source of transportation to commit another crime, joyriding, and to a lesser degree, to derive a profit from the resale of the vehicle or its parts.

Department of Justice, An Analysis of Carjacking in the United States (Oct. 14, 199[...] 2-3 (emphasis supplied) ("The San Juan Division notes that only eight percent of th[...] vehicles carjacked in their division are recovered suggesting that they are either [...] chopped, replated, or exported.")

From these several sources, the majority reasons that carjacking is becom[...] more effective way for car-theft rings to steal cars. Maj. op. at 29. While the m[...] has done a fine job in constructing this argument in its attempt to preserve the constitutionality of § 2119, I cannot agree that Congress could have rationally co[...] that carjacking constitutes conduct that contributes significantly to the operation[...] car-theft operations. This is especially so in view of the fact that the number of[...] reported carjackings at the time of the enactment of the Anti-Car-theft Act of 1992[...] constituted less than 2% of the number of autos stolen in this country on an annual[...] basis.[0]

The majority draws the legal support for its argument from the Court's op[...] in Perez v. United States, 402 U.S. 146, 91 S. Ct. 1357 (1971), where, as the major[...] recognizes, the Court upheld a criminal loan sharking provision because Congress co[...] that intrastate loan sharking constituted a significant aspect of the operation of [...] organized crime, which had an adverse effect on interstate commerce. While the leg[...] framework of the majority's argument is similar to Perez, this case is clearly

[0]See Department of Justice, An Analysis of Carjacking in the United States (Oct. 14[...] at 33; Nancy Gibbs, Hell on wheels; Car Crime is no longer a matter of stealing par[...] of taking lives -- and an American icon becomes less and less of a sanctuary, TIME [...] (August 16, 1993) ("The FBI estimates that there were 25,000 carjackings last year [which] is still only a tiny fraction of the 1.6 million annual car thefts.").

distinguishable, since in <u>Perez</u> the Court relied on extensive congressional finding "grew out of a `profound study of organized crime, its ramifications and its impli undertaken by some 22 Congressmen," <u>id.</u> at 155, 91 S. Ct. at 1362 (<u>quoting</u> 114 CONG at 14391). These findings in turn relied on an executive branch report stating "th sharking was `the second largest source of revenue for organized crime,' and is one which the underworld obtains control of legitimate businesses." <u>Id.</u> (<u>quoting</u> THE C OF CRIME IN A FREE SOCIETY, A REPORT BY THE PRESIDENT'S COMMISSION ON LAW ENFORCEMENT AND ADMINISTRATI JUSTICE 190 (February 1967)).

The <u>Perez</u> Court recognized that these findings "supplied Congress with th knowledge that the loan shark racket provides organized crime with its <u>second</u> most lucrative course of revenue, exacts millions from the pockets of people, coerces it victims into the commission of crimes against property, and causes the takeover by racketeers of legitimate businesses." 402 U.S. at 156, 91 S. Ct. at 1362 (emphasis added). Given these findings, the majority cannot assert that the role of carjacki the operation of inter-state car-theft rings approaches anywhere near the essential of loan sharking in the operation of organized crime. Indeed, in constructing its argument the majority can point to little more than random newspaper clippings to s that carjacking has <u>any</u> relationship to interstate car-theft rings, let alone a relationship comparable to that of loan sharking to organized crime. Accordingly, cannot agree that the majority's analysis establishes a relationship between carjac and car-theft rings of a degree that satisfies existing constitutional requirements

IV. CONCLUSION

In sum, I believe that non-commercial intrastate crimes, even ones receiv publicity in the national media, are a matter of state and not federal concern. Pr courts were correct to conclude that although § 2119 "may <u>stretch the outer limits</u> Commerce Clause, under current doctrine it is not unconstitutional." <u>United States</u>

27

Overstreet, 40 F.3d 1090, 1093 (10th Cir. 1994) (emphasis added).  However, after I believe that the outer boundary has shifted, since, as I have demonstrated, Lopez i just another Supreme Court case, but a watershed.  For all of the foregoing reasons respectfully dissent.